J.L. v A.D.L-S. (2024 NY Slip Op 50371(U))

[*1]

J.L. v A.D.L-S.

2024 NY Slip Op 50371(U)

Decided on April 5, 2024

Supreme Court, Westchester County

Hyer, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on April 5, 2024
Supreme Court, Westchester County

J.L., Plaintiff,

against
A.D.L-S., Defendant.

Index No. 61900/2016

James L. Hyer, J.

Relevant Background & Procedural History
The parties were married on September 16, 2010, in New York, New York. There are two children of the marriage, being: (1) H.V.L. (DOB: XX/XX/20XX12); and (2) C.B.L. (DOB: XX/XX/2015) (hereinafter referred to as the "Children"). On August 23, 2016, Plaintiff commenced this action, with the assistance of legal counsel, seeking, inter alia, the dissolution of the parties' marriage. Defendant appeared in this action with legal counsel, and on March 27, 2017, the parties entered into a Preliminary Conference Stipulation/Order, wherein they agreed that the grounds for the dissolution of the parties' marriage would be pursuant to New York State Domestic Relations Law (hereinafter referred to as "DRL") § 170(7), in that the parties' marriage had irretrievably broken down for a period in excess of six months.
On July 19, 2017, the Court entered an Order Appointing Privately Paid Attorney for the Children, wherein John C. Guttridge, Esq., was appointed as attorney for the Children.
On September 7, 2017, the parties entered into a Parenting Agreement which was "so ordered" by the Court (hereinafter referred to as the "Parenting Agreement"), which resolved all custody and access issues pertaining to the Children. The Parenting Agreement was also signed by John C. Guttridge, Esq., as attorney for the Children.
Article II of the Parenting Agreement provides that the parties shall have joint legal custody of the Children, with the parent exercising parenting time making day-to-day routine decisions pertaining to the Children, and major decisions being made jointly by the parties after a consultation procedure set forth therein (NYSCEF Doc. No. 68 at 2-6). Article III of the Separation Agreement provides for shared physical custody of the Children, with Defendant being deemed the primary physical custodial parent for child support purposes, outlining a routine and vacation/holiday schedule (NYSCEF Doc. No. 68 at 6-9). Sections E, F, G, and H, recognize an Order of Protection then in effect pertaining to Defendant, setting forth the following (NYSCEF Doc. No. 68 at 9):
"E. Both parties acknowledge that an Order of Protection was issued on May 11, 2017 [*2]by the Hon. Robert J. Ponzini against the Mother in the matter, People of the State of New York v. A.L., bearing Docket No. 17050120, which is currently pending in the Mount Pleasant Town Court (hereinafter sometimes referred to as "Order of Protection"). A copy of said Order of Protection is annexed hereto and made a part hereof as Exhibit "A". Both parties acknowledge and represent that this So-Ordered Parenting Stipulation shall constitute a subsequent order issued by a supreme court in a custody or visitation proceeding, as described in the Order of Protection.
F. The Mother shall be permitted to communicate with the Father via telephone, text message, email, voice-mail and through a third party (i.e., child care provider) regarding substantive and legitimate issues concerning the children in a non-threatening and nondisparaging manner, and such contact shall not be deemed a violation of the Order of Protection. The Mother shall be permitted to have incidental contact with the Father during all pick-up and drop-off exchanges of the Children and any communication between the Parties shall be limited to legitimate issues concerning the exchange of the Children. Such communication/contact shall not be deemed a violation of the Order of Protection.
G. The Mother shall be permitted to have incidental contact with the Father during all events and activities for the Children where both Parties are present, including but not being limited to all school and school-sponsored events, extracurricular activities and any other events or activities at which parents are permitted. Such contact shall not be deemed a violation of the Order of Protection.
H. The Order of Protection shall be deemed amended to include the following language: A.L. shall refrain from communication or any other contact by mail, telephone, email, text, social medial, voice mail, or other electronic or other means with third-parties maligning or disparaging J.L."
Article IV(C)(2) of the Parenting Agreement provides the following with respect to the manner in which the parties are to communicate with each other and the Children (NYSCEF Doc. No. 68 at 10-11):
"The Parents shall each exert every reasonable effort to maintain free access and unhampered contact between the Children and the other Parent. Neither the Father nor the Mother shall denigrate the other Parent, the other's Parent's family or the other Parent's boyfriend, girlfriend, etc., or allow, to the extent of her/his ability, third-parties to do so. Neither party shall do anything that may estrange the Children from the other Parent or injure the Children's opinions or affection as to the other Parent or which may hamper the free and natural development of the Children's love and respect for the other Parent. Neither the Father nor the Mother shall utilize the Children as a go-between or messenger between the Parents."
Article IV(G) of the Parenting Agreement provides that, "No modification, rescission or amendment to this Stipulation, or any party thereof will be effective unless in writing signed by the Parents with the same formality as this Stipulation, or if made by a Court of competent jurisdiction on notice to both Parents, or ex parte in the discretion of such Court" (NYSCEF Doc. No. 68 at 12).
Article IV(L) of the Parenting Agreement provides that both parties have executed the [*3]document voluntarily; in the absence of fraud, duress, coercion, pressure, or undue influence; have been informed of their legal rights; have acknowledged the document is a fair agreement understanding all of the terms; and have had assistance of legal counsel (NYSCEF Doc. No. 68 at 12)
On October 3, 2017, a Trial Readiness Order was entered and on October 4, 2017, a Note of Issue was filed.
On February 14, 2018, the parties entered into a Stipulation of Settlement resolving all of the remaining issues arising out of the dissolution of the parties' marriage, (hereinafter referred to as the "Stipulation of Settlement"), which was "so ordered" by the Court.
Article V of the Stipulation of Settlement set forth the parties' obligations commencing on January 1, 2018, with respect to child support of the Children, including: (1) basic monthly child support to be paid by Plaintiff to Defendant in the amount of $7,292.00 per month and upon emancipation of the first child, the reduced amount of $4,958.00; (2) Plaintiff to pay 100% of the nursery school tuition of C.B.L.; (3) Plaintiff to pay 100% of the cost of health insurance coverage for the Children; (4) Plaintiff to pay 100% of the costs of the Children's mutually agreed upon, non-elective, non-cosmetic, unreimbursed, medical, dental, orthodontia, pharmaceutical, optical, hospitalization and therapy expenses; (5) Plaintiff to pay the cost of the tennis program at Club Fit ($1,850.00 per annum) for H.V.L., and to pay the cost of a tennis program at Club Fit ($1,850.00 per annum) for C.B.L.; (6) Plaintiff to contribute 50% of the costs of any mutually agreed upon private or group tennis lessons for one of both of the Children not to exceed $1,000.00 (Plaintiff's contribution) annually; (7) Plaintiff to pay 100% of the reasonable cost of a mutually agreed upon summer camp for the Children; and (8) upon Defendant obtaining employment outside the home, the parties to share the reasonable costs of Defendant's childcare expenses directly attributable to her employment on a pro-rata basis, with the understanding that at that time the parties' respective pro rata contributions to medical expenses, summer camp, Club Fit tennis program and nursery school will be adjusted to account for the Defendant's share of the then combined parental income of the parties (NYSCEF Doc. No. 73 at 24-26).
Article XIII of the Stipulation of Settlement confirms that both parties were represented by counsel in the negotiation and execution of the document; Article XIV confirms that both parties freely and voluntarily entered into the Agreement finding the agreement fair and reasonable; and Article XVII(6) provides that, except as set forth within the document, any modification of the document must be by written agreement, duly subscribed and acknowledged with the same formality as the Stipulation of Settlement (NYSCEF Doc. No. 73 at 41-44, 47). 
On March 14, 2018, this Court entered a Findings of Fact and Conclusions of Law, as well as a Judgment of Divorce was entered which incorporated by reference, but did not merge, the terms set forth within the Parenting Agreement and the Stipulation of Settlement. On March 5, 2018, a Notice of Entry of the Findings of Fact and Conclusions of Law, and Judgment of Divorce was filed.
On November 16, 2020, Plaintiff filed an Order to Show Cause (hereinafter referred to as "Motion Sequence #4), requesting that this Court enter an Order to modify the Parenting Agreement and Judgment of Divorce; including relief pertaining to the Order of Protection entered on May 16, 2019, by the Hon. Robert J. Ponzini, against the Defendant in the matter People of the State of New York v. A.D.L., bearing Docket Number [redacted]; and granting such other relief as this Court deems fit.
On January 7, 2021, Attorney Guttridge was again appointed as attorney for the Children. On June 7, 2021, a Decision and Order was entered (Quinn Koba, J.) pertaining to Motion Sequence #4 wherein the Court determined that Plaintiff failed to raise any question as to the existence of a substantial change in circumstances that would necessitate the Court holding a hearing to determine whether the current parenting and access schedule should be modified, and which denied the relief requested in Motion Sequence #4 (NYSCEF Doc. No. 126). On June 11, 2021, a Notice of Entry of this Decision and Order was filed with the Court.
On October 26, 2021, Defendant filed an Order to Show Cause (hereinafter referred to as "Motion Sequence #5"), seeking an Order: (1) directing Plaintiff to pay $10,687.50, as and for counsel fees incurred by Defendant in Motion Sequence #4; (2) directing Plaintiff to pay counsel fees of Defendant arising out of Motion Sequence #5; and (3) granting other relief as the Court deems fit. On June 22, 2022, a Decision and Order was entered pertaining to Motion Sequence #5, wherein the Court denied the relief requested (NYSCEF Doc. No. 143 [Quinones, J.]).
On January 10, 2024, Plaintiff filed an Order to Show Cause (hereinafter referred to as "Motion Sequence #6"), which requested that the Court enter an Order:
"A. Permitting the two (2) unemancipated children, H.V.L. (age 11; DOB: xx/xx/2012) and C.B.L. (age 8; DOB xx/xx/2015) (the "Children") to permanently relocate with Plaintiff to Arizona;
B. Awarding Plaintiff physical custody of the Children;
C. Granting Plaintiff final decision-making authority with respect to education (including school enrollment), extracurricular activities, medical, dental and therapeutic issues related to the Children;
D. Vacating the child support provision of the Stipulation of Settlement, dated February 14, 2018, obligating Plaintiff to make monthly child support payments to Defendant;
E. Awarding Plaintiff child support for the Children, with a directive to exchange financial information by a date set by the Court; and
F. Granting Plaintiff such other and further relief as this Court may deem just and proper."
On January 10, 2024, the Court conformed Motion Sequence #6, wherein the Court directed: (1) denying the interim relief requested pending the outcome of Motion Sequence #6; (2) the return date for Motion Sequence #6 to be January 12, 2024, at 2:00 p.m.; (3) directing service of Motion Sequence #6 on Defendant via e-mail and NYSCEF filing; (4) directing counsel and Defendant to appear in-person unless they contact chambers at [redacted] by 10:00 a.m. on January 12, 2023, requesting a Teams link to appear remotely because they are outside New York State, Plaintiff may appear remotely based on his attorney's request submitted simultaneously with this motion; and (5) on the return date, the Court will set a briefing schedule, if needed (NYSCEF Doc. No. 182).
On January 11, 2024, the Court entered the following: (1) Order Appointing Privately Paid Attorney for the Children appointing attorney Guttridge again to represent the Children; and (2) Order of Consolidation wherein the proceedings pending in the Westchester County Family Court under File Number [redacted], Docket Number [redacted] (hereinafter referred to as the "Family Court Proceeding"), were consolidated and ordering that any Temporary Orders of Protection issued in the Family Court shall remain in effect.
On January 12, 2024, Plaintiff and Plaintiff's counsel appeared as directed in Motion [*4]Sequence #6, and no appearances were made by Defendant or any attorney appearing for Defendant, nor did Defendant request an adjournment as required by the Part Rules of the Hon. James L. Hyer. On January 16, 2024, an Order was entered providing that:
"It is hereby ORDERED that:
1. The briefing schedule for Motion Seq. #6 is as follows: a. January 26, 2024 - Deadline for opposition to Order to Show Cause and/or Cross Motion; b. February 9, 2024 - Deadline for reply to Order to Show Cause and/or opposition to Cross Motion; c. January 16, 2024 - Deadline for reply to cross motion, return date for both motions, no appearance, no oral argument, decision to be made on submission.
2. Plaintiff is granted interim sole legal and physical custody of the parties' minor Children.
3. Plaintiff s child support obligations to Defendant pertaining to the Children are hereby suspended.
4. Plaintiff shall serve a copy of this Order on Defendant via e-mail and text message by January 16, 2024. and shall file proof of service by that date.
5. Plaintiff shall serve a copy of this Order on the attorney for the Children via e-mail by January 16, 2024. and shall file proof of service by that date.
6. Plaintiff s counsel shall order a copy of the transcript, pay the cost of same and submit to the Court to be "So ordered" by January 26, 2024."
On January 16, 2024, a Temporary Order of Protection was entered; having an expiration date of January 11, 2024; directing Defendant to: (1) stay away from the home Plaintiff and the Children; (2) stay away of the school of the Children; (3) refrain from communication or other contact with Plaintiff and the Children, except to the extent that the Children initiate contact first and such communication be supervised; and (4) refrain from conduct that would constitute a family offense against Plaintiff and the Children (hereinafter referred to as the "Order of Protection") (NYSCEF Doc. No. 184)
On January 16, 2024, Plaintiff's counsel filed proofs of service on Defendant of the following: (1) 22 NYCRR 202.7 Notice; (2) proposed order to show cause pertaining to Motion Sequence #6; (3) Motion Sequence #6, including conformed Order to Show Cause; (4) January 16, 2024 Order; and (5) Temporary Order of Protection.
On January 17, 2024, an Amended Order was entered, after which Plaintiff's counsel filed a proof of service of same upon Defendant and the attorney for the Children.
On January 23, 2024, the attorney for the Children submitted an Affirmation in Support of Motion Sequence #6 wherein he states, in part, that (NYSCEF Doc. No. 195):
"3. I present this affirmation in support of the Plaintiff s application to relocate the children to live with them. The children have faced a tumultuous upbringing due to ongoing litigation and the mother's unfortunate mental health challenges, which have exhibited fluctuations throughout the history of these legal proceedings.
4. I also support the Plaintiff being granted final decision-making authority regarding the children's health, education, and welfare. It is crucial that the children attend therapeutic intervention guided by Dr. Bennett Strober. The possibility of conducting sessions via Zoom with Dr. Strober for the children's convenience is considered, followed by a subsequent transition to a local mental health professional in the Arizona area. This transition aligns with the intention to facilitate the children's enrollment in a school in [*5]Arizona.
5. Given my longstanding involvement in the case since its inception, I acknowledge past rounds of similar allegations where the mother successfully restored a sense of safety for the children. However, the current circumstances raise concerns, leading me to adopt a cautious approach. Due to the sensitivity of the situation and the children's confirmation of not seeing their mother for at least a month and a half, I refrain from delving into specific events."
On January 25, 2024, the Court received correspondence from the self-represented Defendant (dated January 16, 2024), wherein Defendant provided (NYSCEF Doc. No. 197):
"I am writing to request a continuance in the above-referenced case for the following reasons. One, I never received a summons to appear, only a notice by the Plaintiff's attorney of a filed Emergency Order to Show Cause, dated January 10, 2024, to amend our Stipulation of Settlement and end, without due process, my child support. On January 9, 2024, I contacted your office, spoke to your assistant, and was told there was nothing scheduled for an appearance (see attached). Two, the Plaintiff's attorney is/was aware that I am no longer a US resident, but live in Hungary, and due to medical issues (attached) am advised not to travel on long flights. I am in Hungary for medical care and assistance (I am re-married to a Hungarian citizen, and am limited in medical care through Medicaid), and on January 10, 2024, had a rescheduled consultation with a hematologist for my diagnosed blood disease-rescheduled due to my illness with Covid in December. All submitted, January 4, 2024, in my affidavit from our case under Judge Arlene Gordon-Oliver (Index No.[redacted]/Docket [redacted]). Therefore, I would again not be able to appear in court in person and failed to receive timely notice considering my location and health.
The Plaintiff's counsel was also made aware during our appearance (my accepted remote appearance) on January 8, 2024, with Judge Arlene Gordon-Oliver, of her decision to allow me until February 26, 2024, to obtain proper counsel, as my attorney in Budapest, she concluded, could only represent me federally, not in New York State (see attached). I therefore respectfully request a continuance to a later date so that I may have adequate time to obtain legal counsel and prepare for the hearing. I am aware of the importance of this matter, and I apologize for any inconvenience that this request may cause. I also request, as in my case under Judge Arlene Gordon-Oliver, to be allowed to appear remotely.
I would appreciate it if the court could consider granting a continuance until after February 26, 2024, and my child support reinstated, preferably until a final judgement is made by Judge Gordon-Oliver and/or my Affidavit for Opposition is heard and determined before the court. I assure the court that I will use this additional time to obtain legal counsel and prepare for the hearing in a diligent and professional manner."
On January 25, 2024, the Court granted Defendant's request for an extension of the briefing schedule of Motion Sequence #6 previously set by the Court and entered an order providing the following (NYSCEF Doc. No. 198):
"Pursuant to Defendant's letter submitted to the Court via email on or about January 16, 2024, indicating she would like a continuance to file her opposition papers and retain [*6]counsel who is licensed to practice in New York State. It is hereby Ordered that:
l. The briefing schedule for Motion Seq. #6 is as follows: a. February 9, 2024 - Deadline for opposition to Order to Show Cause and/or Cross Motion; b. February 23, 2024 - Deadline for reply to Order to Show Cause and/or opposition to Cross Motion; and c. March 8,2024 - Deadline for reply to cross motion, return date for both motions, no appearance, no oral argument, decision to be made on submission.
2. All other Orders and Directives shall remain in effect."
Despite the Court having provided Defendant with an extension of time to file an opposition submission and/or cross motion with respect to Motion Sequence #6, Defendant failed to file any opposition submission or cross motion. On March 1, 2024, a Decision and Order was entered pertaining to Motion Sequence #6 wherein it was (NYSCEF Doc. No. 200):
"ORDERED that Motion Sequence #6 is granted to the extent that the Court shall hold a Hearing on the relief requested therein on March 12, 2024, at 9:00 a.m., wherein all counsel and parties are required to appear in-person; and it is further
ORDERED that both parties shall by March 8, 2024, file with the Court and serve on the opposing party via e-mail or overnight delivery or text message, along with proof of service upon the opposing party, the following: (1) Exhibit List with copies of exhibits to be utilized at the Hearing, with the understanding that if exhibits are not listed and/or exchanged they will not be utilized at the hearing; and (2) Witness List of all witnesses to be called to provide testimony at the Hearing, with the understanding that if witnesses are not disclosed pursuant to this directive they will be prohibited from providing testimony at the Hearing; and it is further
ORDERED that Plaintiff's counsel shall serve a copy of this Order upon Defendant by email or overnight delivery or text message, and shall proof of service with the Court, by March 4, 2024; and it is further
ORDERED that to the extent relief has not been granted herein it is expressly denied."
On March 4, 2024, Plaintiff's counsel filed a Notice of Entry of the March 1, 2024, Decision and Order, and an Affidavit of Service of same on Defendant. On March 5, 2024, upon the request of the attorney for the Children, the Court entered an Order adjourning the Hearing to March 22, 2024, at 9:00 a.m. On March 7, 2024, upon the request of Plaintiff's counsel, the Court adjourned the Hearing to March 22, 2024, at 11:00 a.m.
On March 15, 2024, Plaintiff's counsel filed the following: (1) Witness List; (2) Exhibit List; and (3) Exhibits 1-46. On March 18, 2024, Plaintiff's counsel filed proof of service of NYSEF Doc. Nos. 208-253 on Defendant.
On March 20, 2024, after the court-ordered deadline to file opposition to Motion Sequence #6 and after the court-ordered deadline to file pre-hearing disclosure, the Court received and filed Defendant's Affidavit in Opposition dated January 3, 2024, including Exhibits A-M (hereinafter referred to as "Defendant's Affidavit"). Defendant's Affidavit provides the following sworn testimony of Defendant (NYSCEF Doc. No. 257 [emphasis added]):
"1. That I am the Defendant in the above captioned action and am fully familiar with the facts recited herein and make this Affidavit in opposition to Plaintiff's Order to Show Cause that I have been an unfit parent that has "abandoned" our children***.
2. The Judgement of Divorce of this Court dated March 13, 2018, incorporated, but did not merge into the Judgement of Divorce, the Stipulation of Settlement including a So Ordered Parenting Stipulation dated September 7, 2017. A copy of the Judgement of Divorce and So Ordered Parenting Stipulation is annexed hereto.
3. The response filed January 14, 2021, in opposition to the Plaintiff's last Family Court motion against me (Index No. [redacted]), noted, "At the time my divorce was finalized, I thought I had at least some closure to the turmoil of the divorce process...," but the Plaintiff has yet to cease traumatizing, abusing, and attempting to "exercise control over me, harass me and attempt to avoid paying child support." The Court summarily denied the Plaintiff's application. (Exhibit A)
4. In the following paragraphs, I will simply refute the lies and false accusations that have been leveled against me yet again. I am a 48-year-old woman with two college degrees (BA International Relations with an emphasis in Mid-East Relations and an MA in Professional Writing, University of Southern California) and until my divorce with the Plaintiff, had no criminal record. However, let the court be aware that I am not seeking another custody battle with the Plaintiff. I am, in fact, giving up our present joint custody and giving the Plaintiff full custody of our two children, ***. I will not continue to allow the Plaintiff to lie and weaponize our children for financial purposes in family court for another decade. In addition, as the Plaintiff has been made aware for over a year, I am now physically unwell to participate in this process/charade any longer. I have thyroid disease and must have surgery on a 3.4-3.7 cm tumor (I am losing the ability to properly swallow food and water) and was recently diagnosed with a blood disease that I was informed puts me at risk for infections, blood clots and cardiac arrest. I also show risk factors for heart disease. My mother died of a second cardiac arrest on June 25, 2022. For years, I have struggled with leukopenia (low white blood cell count) and sometimes debilitating lack of energy. Now my blood count is dangerously low and am being tested for bone marrow cancer and an autoimmune disorder that my doctor believes was never properly diagnosed/treated. Dr. Varga has advised against long flights and being in crowds, and I can only participate in these proceedings remotely, if at all. At present, I have days where I can barely get out of bed and am scheduled to go into a rehabilitation facility here in Hungary. I also recently learned that my previous home's well water (Pleasantville, NY) was contaminated with dangerous E. Coli bacteria for many years. "There are approximately 80 suspected or known autoimmune disorders that may be related to water quality issues" notes H20 Water Research Center. (Exhibit B)
5. I am no longer a US resident, after selling my co-owned home with the Plaintiff, in Pleasantville, New York on November 22, 2023, and have applied for permanent residence status in Hungary with my present husband, Diplomat and Olympic athlete, V.S. All my close family are deceased, and my husband and his family are my only sources of physical/medical assistance. The Plaintiff would not agree to my request to move our children with me to Hungary, and I could not and cannot afford to press this move in court. (Exhibit C)
6. A big issue with assistance after surgery/treatment/recovery is that my husband and his family again are my only means of support. Unfortunately, my husband's ESTA was declined for renewal due to overstaying last Christmas while awaiting a USCIS extension that came late (he's not a US citizen and the political climate with US/Hungarian [*7]relations is low-several Hungarian Diplomats and celebrities have recently had their travel documents seized without warning or reason), and therefore, he is unable to get back to the US. Due to my husband's celebrity status as a top professional Hungarian athlete and Olympian, his inability to reunite with his wife and family back in the US made headlines this year. The office of United States Representative, Mike Lawler, even reached out to the US Embassy in Hungary to assist us, yet unsuccessfully. (Exbibit D)
7. I have been the victim of the Plaintiff's physical and mental abuse for eighteen years, spending almost eight years alone in court defending myself against confirmed lies by Family Court and Child Protective Services. Unfortunately, I spent twelve plus years covering up my abuse and protecting the Plaintiff, even failing to file my own protective order against the defendant in 2017. I feared seeing him jailed for physical assault, drug abuse (he was a frequent user of marijuana and cocaine) and rape. In 2005, the Plaintiff confessed to raping me to my therapist, Dr. Antoinette Corley Newman of Torrance, California, during a couple's therapy session. After that session, Dr. Corley-Newman privately advised me, "Don't walk, run from this man." Sadly, I had bad self-esteem and failed to heed her advice. (Exhibit E)
8. In July of 2017, a year after filing for divorce, and being informed during mediation the sum he would be required to pay in child support to me ($7292 a month), the Plaintiff filed the same "Emergency Takeover" "Order of Protection" of our children then as well. The Plaintiff penned a laundry list of allegations against me that were later proven false. Adding my dislike and lack of kindness towards his family-where I suffered racial prejudice (my mother is African American, and my father is Caucasian) and listened to his family's dislike of Mexicans, blacks, and Jews. The Plaintiff's former sister-in law, A.L., told me at a family dinner December of 2009, in Colorado, that "Black people should still be slaves. They were happier as slaves." She has a history of mental health issues and has had several arrests. She spent time in jail for a hate crime, physically assaulting people of color. In 2012, the Plaintiff's close cousin, An.L., threatened to find my mother insinuating he would harm herwhen I confronted him on his racism, swastikas on his Facebook, and illegal financial schemes. The Plaintiff's attorney at the time, Brett Kimmel, tried to prove in court that I was mentally unstable for saying I wanted my two boys to grow up to be "strong black men" because my youngest son, he said "even has blond hair." Per my son, H.V.L., he was told by the Plaintiff and his wife, that I am "not really black so you aren't either." Forensic evaluations were ordered by the Honorable judge John Colangelo for both parties. I give the court permission to retrieve and use my records in this case. For the Plaintiff, I seek him to do the same or the court enforces the retrieval. In those HIPAA protected psychiatric evaluations performed by judge appointed psychiatrist, Dr. Ronald Kaitz, it was revealed that the Plaintiff lied, having noted in his filed motion that I was "bipolar" and had been admitted to a psychiatric hospital. I am not bipolar, and this psychiatric hospital/unit did and does not exist. I received my children back immediately after the forensic evaluations were learned by the court. Yet, the Plaintiff was not held accountable or disciplined by Family Court for these legally stated and filed lies against me. (Exhibit F)
9. Ironically, the Plaintiff, alleges my "abandonment" of our children when he is barely a resident of New York State (the children's legal residence) and deserves an adequate tax audit from 2016 to 2022, proving residence (see Matter of Gaied, 22 N.Y3d 592, 2014. [*8]New York's highest appellate court addressed the issue in a groundbreaking case where Hodgson Russ represented the taxpayer. The Court in Gaied held that in order for a dwelling to constitute a PPA, the taxpayer must "use the place as a residence." The PPA must also be maintained for substantially all of the year, which the tax department has historically interpreted as a period exceeding 11 months). His main residence is in Scottsdale, Arizona: [redacted], where his wife and her family are permanent legal residents. Mrs. K.F.-L. and her child from her previous marriage, E.F., are not residents of New York and never have been. If the Plaintiff took his children for one year straight, he could possibly make up for all his missed access time since 2016. (Exhibit G)
10. The Plaintiff, since filing for divorce against me, August of 2016-shortly before our son *** 1st birthday-came and went as he pleased, leaving me to solely maintain the health, education, and well-being of both children as a single mother fighting several underlying medical conditions which I was unaware. The Plaintiff has taken the children approximately four times in their lives to their pediatrician, Dr. Laura MacBeth (Westmed, Rye NY), and the same with their dentists' (Mao Loan, Stacie Silverman-Calian, and Roshe Dental). After the completion of our So Ordered Parenting Stipulation, the Plaintiff was in bold and consistent violation. I, however, chose not to waste my time, energy and dwindling financial resources filing motions for each of his weekly violations. However, I was vocal in correspondence about the violations, his late child support payments, our formerly co-owned residence I could no longer afford to upkeep, etc. The Plaintiff strategically used this against me as verbal/written "harassment" for which I now stand again in contempt of court. Yet, he is not held liable for the crime of aiding and abetting in the form of gaslighting which typifies Narcissistic Personality Disordered abuse. His consistent perjury in Family Court has never been punished. (Exhibit H)
11. Also, note that the Plaintiff, in his latter filed motion made note that his then girlfriend and former mistress-now wife-would be a better mother to our children. Mrs. K.F-L. has a criminal record starting back quite young. Reported to me by my son ***, she also has a history of being physically abusive to the Plaintiff (punching him in a public park in front of both children and throwing her phone at one of the Plaintiff's friends during a dinner party), public drunkenness (falling on top of *** at a holiday party at the home of A.F., her ex-husband) and crashing the Plaintiff's white Ford truck in February of 2019 in Westchester, New York. I was made aware of this accident when the Plaintiff showed up to the Mount Pleasant Police Department for exchanges with a destroyed hood. I was, of course, worried about the safety of my children in her care. (Exhibit I)
12. Considering the latter, along with years of the physical abuse of my children by Mrs. F-L's daughter, E.F., I have never said, texted or emailed one word to her, and the Plaintiff provided her telephone number and email address to me in 2017. She is also guilty of perjury. I finally reached out in 2022, via social media to As.F. (the present wife of A.F.), upon my son *** request. I hoped to get a better understanding of his relationship with her stepdaughter (E.F.) and the abuse my children continued to complain of and exhibit injuries from. (Exhibit J)
13. My oldest son, *** has been mentally unwell for several years. After spending extended time with the Plaintiff as I traveled to and from Hungary (once a month for no [*9]more than 7-9 days per month from February 2023 to October 2023) to see and assist my husband, work with my government on his behalf, his condition worsened. On Friday, October 27, 2023, upon the advice/entreaty of his father, he contacted the Mount Pleasant police (after I did not allow him to attend the Pleasantville High School Varsity game with his friends), to report that I had abandoned he and his brother at our home. He reported he could not find me. Although, I served him dinner in his bedroom and continued packing and cleaning the leaves on our main deck upstairs (our home was a mid-Century ranch with the bedrooms downstairs), as I told him I would be. I was on a deadline to be moved out of my residence and joked with my children that we would soon be homeless-living in a hotel-until I found a new permanent residence. I answered my front door with broom in hand, to find the Mount Pleasant Police awaiting me. Of course, I was enraged as well as extremely exhausted and distraught (my red eye flight arrived that morning) from my illness. *** has had several anxiety/panic attacks where I almost took him to the emergency room this past summer. Also, an incident at school where he made a life altering false report against another student (the school principal and the Pleasantville Police Department were involved). He has made similar reports against his father, his stepmother (he said she dressed in sexy lingerie around him, and he could see her stockings and garter belts under a short robe), and as noted, his stepsister. The Plaintiff found an opportune chance to use our child's faltering mental state for more vindictiveness and strategy to discontinue child support. (Exhibit K)
14. The Plaintiff never responded to have any discussion with myself or my husband on the latter incident involving *** on October 27, 2023. *** also never reached out to my husband as alleged. He oddly deleted messages and then did not respond. My husband's calls and emails were never returned by the Plaintiff. The evidence clearly shows that the Plaintiff consistently requested makeup time with the children-as he failed for seven years to adhere to his access schedule, as he no longer mainly resided in New York, but Scottsdale, Arizona. The first time I ever allowed [J.L.] extended makeup time with our children was August of 2022, as I was inconsolable after the death of my mother on June 25, 2022. I am now finally seeking proper grief counseling again with Dr. Corley-Newman on a remote basis. (Exhibit L).
15. I am asking the Court to dismiss the Plaintiff's Order to Show Cause for failure to prove the necessity of an Order of Protection against me in the protection of our shared children, *** and ***. I have no history of ever abusing or neglecting our children and have no physical ability to fly back to the United States (Exhibit M). It is my sincere wish to end almost two decades of lies, trauma and abuse by the Plaintiff, where I must give up my children at this time to save my physical and mental health. My husband, V.S., is also preparing for the Paris Olympics 2024, and this is an unnecessary distraction and stressor, in addition to assisting me with my health conditions. The Plaintiff's counsel can work with my counsel in Budapest to amend our present custody agreement."
On March 20, 2024, Plaintiff's counsel filed an Objection to Defendant's Trial Exhibits asserting that same should be precluded due to Defendant's failure to file same timely as required by Court Order.
On March 21, 2024, Plaintiff's counsel filed an Affidavit of Service that on March 21, [*10]2024, Defendant and the attorney for the Children were served with: (1) Plaintiff's Objection to Defendant's Trial Exhibits; (2) Plaintiff's Correspondence to the Court; and (3) Amended Exhibit 44.
No additional filings were made with this Court prior to the Hearing which was scheduled in the Decision and Order entered pertaining to Motion Sequence #6.
Hearing Testimony and Documents in Evidence
The Court held the Hearing on March 22, 2024. Plaintiff appeared represented by counsel being Dina S. Kaplan, Esq. The Children were represented by John C. Guttridge, Esq., and Defendant failed to appear. The Court did not receive any adjournment requests of the Hearing by Defendant or any representative of Defendant pursuant to the Part Rules of the Hon. James L. Hyer, J.S.C.
At the Hearing, the following Exhibits were admitted into evidence:
1. Plaintiff's Exhibit 1 — Parenting Agreement, dated 9/7/2017
2. Plaintiff's Exhibit 2 — Stipulation of Settlement, dated 2/14/2018
3. Plaintiff's Exhibit 3 — Judgment of Divorce, dated 3/14/2018
4. Plaintiff's Exhibit 4 — Plaintiff's Family Offense Petition, dated 10/31/2023
5. Plaintiff's Exhibit 5 — Family Court Order of Protection, dated 10/31/2023
6. Plaintiff's Exhibit 6 — Family Court temporary Order of Protection, dated 11/20/2023
7. Plaintiff's Exhibit 7 — Defendant's E-Mail to the Court, dated 1/4/2024
8. Plaintiff's Exhibit 8 — Defendant's E-Mail to the Court, dated 1/8/2024
9. Plaintiff's Exhibit 9 — 22 NYCRR 202.7 Notice, dated 1/9/2024
10. Plaintiff's Exhibit 10 — Defendant's E-Mail, dated 1/9/2024
11. Plaintiff's Exhibit 11 — Order of Consolidation, dated 1/10/2024
12. Plaintiff's Exhibit 12 — Plaintiff's Affidavit in Support, dated 1/10/2024
13. Plaintiff's Exhibit 13 — BBNS Affirmation in Support, dated 1/10/2024
14. Plaintiff's Exhibit 14 — Affidavit of Service, dated 1/10/2024
15. Plaintiff's Exhibit 15 — Affidavit of Service, dated 1/11/2024
16. Plaintiff's Exhibit 16 — Temporary Order of Protection, dated 1/12/2024
17. Plaintiff's Exhibit 17 — Affidavit of Service, dated 1/12/2024
18. Plaintiff's Exhibit 19 — Affidavit of Service, dated 1/16/2024
19. Plaintiff's Exhibit 20 — Affidavit of Service, dated 1/17/2024
20. Plaintiff's Exhibit 22 — Affidavit of Service, dated 3/1/2024
21. Plaintiff's Exhibit 25 — Video of Defendant from December 2017
22. Plaintiff's Exhibit 29 — Defendant's E-Mail, dated 5/1/2024
23. Plaintiff's Exhibit 42 — Letter from Dr. Benna Strober, dated 11/16/2024
24. Plaintiff's Exhibit 44 — Defendant's Affidavit in Opposition, dated 1/3/2024
25. Plaintiff's Exhibit 47 — Resume of Dr. Benna Strober
At the commencement of the Hearing, the Court also marked as Court Exhibits the following: (1) Court Exhibit #1 — Plaintiff's Witness List, disclosing Plaintiff and Dr. Benna Strober as potential witnesses to be called to provide testimony at the Hearing; (2) Court Exhibit #2 - Plaintiff's Exhibit List listing Exhibits 1-46 as potential Exhibits for use at the Hearing; and (3) Court Exhibit #3 — Plaintiff's Objection to Defendant's Trial Exhibits.
Plaintiff's counsel then provided oral argument as to Court Exhibit #3, asserting that all of the documents listed amounted to hearsay and were filed after the court-imposed deadline for [*11]Pre-Hearing Disclosure requiring that they be precluded. The attorney for the Children joined in that application. The Court denied the application on the basis of the late submission of the proposed Exhibits for use at the Hearing due to Defendant being a self-represented party. With respect to the portion of the application that the Exhibits be precluded due to hearsay, the Court denied the application as premature as no request was yet before the Court by any party seeking to offer any of the subject Exhibits into evidence, permitting all parties to reserve the right to make further evidentiary objections to all Exhibits throughout the Hearing. 
Witness Testimony
At the Hearing only two witnesses were called to provide testimony being:
(1) Dr. Bennett Strober
Dr. Strober testified that she is a psychologist, having practiced since 1995. She testified that she met the Children in 2018. She testified that she met several times with H.V.L. who was struggling with severe trauma-related to issues with his mother and her behavior including making inappropriate comments to H.V.L., resulting in H.V.L. being concerned that Defendant might commit suicide. She testified that she stopped meeting with H.V.L. after he began living with Plaintiff and Defendant was "out of the picture" resulting in his improvement. She testified that she only met C.B.L. in the beginning. She testified that in September of 2023, she resumed treatment of H.V.L. and continued until February 2024, when Plaintiff relocated with the Children. She testified that Plaintiff contacted her concerned about Defendant's behavior and the reactions of H.V.L. to that behavior. She testified that it was her understanding that Defendant was texting H.V.L. advising him that she was going to commit suicide and making other inappropriate comments causing him to worry.
She testified that her impression of H.V.L. in 2023 was that with respect to Defendant he was severely traumatized, anxious, sad, confused and hurt. During her second round of treatment of H.V.L. she communicated with Defendant in one in-person meeting, spoke with her on the phone, and exchanged between twenty to thirty e-mails. She testified that these communications with Defendant focused on negative statements regarding Plaintiff and did not involve H.V.L.'s well-being, as Defendant did not express any concern about H.V.L. She testified that she had many conversations with Plaintiff in September of 2023 the substance of which pertained to his vast concern for the Children where he expressed concern about the mental well-being of H.V.L., about the impact of Defendant abandoning him and making in appropriate statements to him. She testified that during her treatment of H.V.L. from September 2023 to February 2024, in her professional opinion, Defendant was not a safe parent and Plaintiff was.
When presented with Plaintiff's Exhibit 47, which was moved into evidence, Dr. Strober identified the document as her "CV", which she authored and which accurately sets forth her professional background. She testified that her specialty as a psychologist is child adolescence wherein she frequently works with children of divorce. She testified that she has been appointed by the courts to conduct child evaluations and that she has testified before the Westchester Supreme Court as a psychological professional wherein she was qualified as an expert approximately forty times. Plaintiff's counsel made an application that the witness be acknowledged to be an expert in the treatment and as a therapist for children in adolescence with a specialty in custody cases. No objection was received by the attorney for the Children, and the Court granted the application.
When presented with Plaintiff's Exhibit 42, which was moved into evidence, she testified [*12]that the document was a letter she wrote regarding her treatment of H.V.L., dated November 16, 2023, after being asked to provide her judgment regarding the parties. Dr. Strober testified that Plaintiff requested the letter, and it was presented to the Child Protective Service (hereinafter "CPS"). She testified that she has no concerns about the safety of the Children with Plaintiff, but that the Children are unsafe with Defendant. She testified that this was based on her opinion from therapy sessions with H.V.L., information received from Defendant, information received from the parties, and CPS.
Dr. Strober testified that Plaintiff requested assistance regarding recommendations as to how to handle situations that may arise with H.V.L. and how to communicate with him, and to her knowledge Plaintiff implemented those suggestions. She testified that these suggestions included permitting H.V.L. to have more friends and to spend time with those friends. Dr. Strober believed repair needed to take place from the damage to H.V.L. as a result of Defendant's statements to him about Plaintiff, which H.V.L. needed to see were false. Dr. Strober testified that H.V.L. had discussed during their therapy sessions H.V.L. some of these negative comments he had heard about Plaintiff from Defendant. She testified that according to H.V.L., in the past, Defendant had berated him regarding his relationship with Plaintiff, and H.V.L. needed to benefit from time with Plaintiff without Defendant's actions frustrating that relationship.
Dr. Strober communicated with CPS and informed the case worker that she believed the children were not safe with Defendant. She testified that to a reasonable degree of psychological certainty, she believes that Plaintiff is a better person at this time to meet the needs of H.V.L.
(2) Plaintiff J.L.
Plaintiff testified that he is currently residing in the State of Arizona with his wife, stepdaughter, and Children. He testified that the Children had previously been residing in Briarcliff Manor, New York. He purchased a home in Briarcliff Manor in 2018 and a home in Arizona in 2019, so that he could travel back and forth to exercise his parenting time with the Children. Plaintiff explained that when the Children resided in New York, H.V.L. attended the Pleasantville Middle School and C.B.L. attended the Bedford Road School, both being enrolled in the Pleasantville School Systems their entire scholastic career. The Children then resided with Defendant, who remained in the former marital home until it was sold on November 22, 2023.
Plaintiff testified that the Children began attending school in Arizona in January 2024, with H.V.L. being in sixth grade and C.B.L. in third grade. He testified that H.V.L. is doing well, has many friends, is involved in track & field, and is primarily doing well scholastically. He testified that C. L. is also doing well, has many friends, enjoying basketball and football. He testified that prior to the Children relocating to Arizona, the Children had been visiting there since 2017.
Plaintiff explained that he came to Court due to Defendant's increasing behavior and after she had been arrested for the third time in August 2023. He felt he needed to take action. Plaintiff testified that Defendant constantly berated him and his family, threatening his parenting time. He stated that while there was an Order of Protection in place, Defendant would utilize a "carve out" to text him about the Children and then engage in harassment. Plaintiff testified that Defendant's mood swings were damaging to the Children and damaging to co-parenting. He described an incident in December 2017 where he characterized Defendant's behavior as manic wherein during an exchange of the Children, her volatility resulted in the police bringing her to [*13]Westchester Hospital for an evaluation. Plaintiff noted that this was the third time she had been taken by the police to the hospital for an evaluation. He testified that the incident resulted in the police contacting CPS about Defendant, and this was the family's first involvement with CPS. He testified that a result of the incident he was granted an Order of Protection against Defendant.
Plaintiff stated that another incident occurred in August [2018] where he and his wife filed a police report at the Briarcliff Manor Police Department due to Defendant having sent approximately seventy harassing e-mails within the period of twenty days. As a result, Defendant was arrested. He testified that Defendant took C.B.L., who was then approximately three years old, to the police department for her "mug shot" and told C.B.L. she was being arrested because of Plaintiff. Plaintiff testified that he continues to have Orders of Protection against Defendant in favor of him, his wife, and his stepdaughter.
He then testified about an incident that took place on October 27, 2023, when he received several calls from a crying H.V.L. who stated that he did not know where Defendant was. Plaintiff called the Pleasantville Police Department and requested that a welfare check be conducted. He testified that approximately five minutes later, at around 8:00 p.m., Plaintiff received communication from H.V.L. that he found Defendant in the backyard of the property raking leaves. He then testified that he called the police to advise that the welfare check was not needed, and finally:
"The next call I receive was a Police Officer or a Sergeant from Mount Pleasant. I think a Sergeant was called in. And said something to the effect that, in my entire career of 20 or 30 years in the Police Department, I've never had to take children like this. And the mother has relinquished them voluntarily to the Police. We're filing a CPS report and we will be in touch. But you can come pick them up tonight."
He testified that he then took the next flight and picked up the Children who have remained with him since.
Plaintiff stated that Defendant has since not attempted to contact the Children and the Children have not asked about her. He testified that Defendant is currently residing in the country of Hungary, is no longer a citizen of the United States of America (hereinafter "USA"), and he believes she was last in the USA on October 28, 2023. Plaintiff testified that Defendant has remarried a man who is not a US citizen and not permitted to enter the country.
When presented with Plaintiff's Exhibit #1, which was admitted into evidence, Plaintiff identified the document as the parties' Parenting Stipulation Agreement, which was executed by the parties in October of 2017. When presented with Plaintiff's Exhibit #2, which was admitted into evidence, he identified the document as the Stipulation of Settlement. Plaintiff's Exhibit #3 was admitted into evidence with the Court taking judicial notice of same. When presented with Plaintiff's Exhibit #4, which was admitted into evidence, Plaintiff identified the document as a Family Offense Petition, dated October 31, 2023, that he filed against Defendant due to the incident which occurred just days before that filing. The Court took judicial notice of Plaintiff's Exhibit #6 which was moved into evidence. When presented with Plaintiff's Exhibit #7, which was admitted into evidence, Plaintiff identified it as an e-mail from Defendant, dated January 4, 2024.
When presented with Plaintiff's Exhibit #8, which was admitted into evidence, he identified it as an e-mail from Defendant. When presented with Plaintiff's Exhibit #9, which was admitted into evidence, Plaintiff identified it as an e-mail from Defendant. When presented with [*14]Plaintiff's Exhibit #10, which was admitted into evidence, Plaintiff identified it as an e-mail from Defendant. The Court took judicial notice of Plaintiff's Exhibit #11, which was moved into evidence. When presented with Plaintiff's Exhibit #12, which was admitted into evidence, he identified it as his affidavit in support. When presented with Plaintiff's Exhibit #13, which was admitted into evidence, Plaintiff identified it as his attorney's affirmation in support. The Court took judicial notice of Plaintiff's Exhibits #14, #15, #16, #17, #19, #20, #22, which were moved into evidence.
When presented with Plaintiff's Exhibit #23, he identified it as a case report from Dr. Yukio Ishizuka, a therapist that worked with the parties in couple therapy. Plaintiff stated that this document was an "abridged version" of a document approximately eighty to ninety pages in total length. Upon request that this document be moved into evidence, no objection was made by the attorney for the Children, and the Court denied the request due to the report being unsigned, a copy and not certified.
Plaintiff testified as to Defendant's relationship with H.P. (hereinafter "H.P.") the owner of a small childcare provider near his former New York residence with whom Defendant once had a strong relationship which deteriorated. He testified that following a group text within which both Defendant and H.P. were included, H.P. became concerned that Defendant might commit suicide and she then conducted a welfare check on Defendant. Plaintiff testified that Defendant was offended, resulting in her not permitting H.P. to continue as the parties' then-daycare provider, and disparaging H.P.'s business online.
Plaintiff then testified regarding an incident which took place in Manhattan where Defendant engaged in a violent altercation with another woman pulling her hair and punching her. He testified about another incident when Defendant had been speaking to one of the parties' friends and became catatonic on the floor saying that she wanted to kill herself, resulting in the friend contacting the police and Defendant being taken to White Plains Hospital. Plaintiff was later informed that Defendant attempted to flee during the night in her bra and panties requiring that she be subdued.
Plaintiff was then presented with a video marked as Plaintiff's Exhibit #25. The video was played in open court and the document was moved into evidence. Plaintiff testified that he took the video during December 2017, prior to Christmas break when he was getting the Children, resulting in Defendant being hospitalized, CPS being called, and an Order of Protection being issued. Plaintiff spoke about another incident that occurred when he was picking up the Children where Defendant was shoveling the snow and took the shovel to his vehicle, as well as his to face when the window was down.
When presented with Plaintiff's Exhibit #27, Plaintiff testified that he recognized it, and an application to move the document into evidence was made with no objection by the attorney for the Children but denied by the Court as the document was an uncertified copy. When presented with Plaintiff's Exhibit #29, which was moved into evidence, Plaintiff identified the document as an e-mail from Defendant to him wherein she suggested he take the Children. He testified that it was the first time Defendant stated her intent to relinquish custody of the Children. Plaintiff stated that she then left after twenty-four hours' notice for several weeks first telling H.V.L. that it was his fault.
Plaintiff testified that since Defendant abandoned the Children, he has welcomed them into their home. Plaintiff attempted to discuss a change in custody with Defendant, and her terms included dropping an Order of Protection and substantial sums of money. When presented with [*15]Plaintiff's Exhibit #40, which was moved into evidence, Plaintiff identified the document as an Arizona CPS letter initiated by Defendant who asserted Plaintiff's stepdaughter attempted to murder C.B.L. Plaintiff spoke about Defendant's inappropriate derogatory statements about him to the Children. The Court took judicial notice of Plaintiff's Exhibit #44, which was moved into evidence and which Plaintiff's counsel stipulated could be considered a pleading.
Plaintiff testified that he is a very present father who has grown into that role over the years and through this experience. He testified that he would like full custody of the Children and to have sole decision-making for them. He testified that if Defendant sought to re-enter the lives of the Children, he would want it to be in a controlled and supervised manner. Plaintiff stated that if Defendant can form a healthy relationship with the Children, he would support it. He testified that he is requesting that child support payments due from him to Defendant be terminated and that he is not seeking a child support award from Defendant pertaining to the Children.
Findings of Fact & Conclusions of Law
a. Admissibility of Defendant's Affidavit
Since the right to cross-examine is fundamental, affidavits should not be utilized from witnesses who are not made available in court and should be disregarded for purposes of making an ultimate determination as to the issues before the Court. (see Seinfeld v Robinson, 300 AD2d 208 [1st Dept 2002]; see Also State of New York v Metz, 241 AD2d 192 [1st Dept 1998]; Campaign for Fiscal Equity v State, 182 Misc 2d 676 [Sup Ct, NY County 1999]). However, upon being advised of their right to cross-examine witnesses, a party may waive that right, electing to permit the Court to consider sworn submissions by witnesses. (see Smith v Wamsley, 265 AD2d 663 [1st Dept 1999]).
Defendant filed an Affidavit of Defendant after the Decision and Order was entered pertaining to Motion Sequence #6 and prior to the Hearing scheduled within that Decision. Accordingly, the Affidavit was not taken into consideration by the Court when preparing the Decision and would not have been considered in lieu of testimony at the Hearing without a waiver of the right to cross-examine Defendant by Plaintiff. However, the Court has determined that Plaintiff, while represented by counsel who presumably advised Plaintiff of his rights, waived this right by offering the document into evidence at the Hearing as Plaintiff's Exhibit #44, thereby requesting that the Court consider the Defendant's statements made therein.
b. Witness Credibility
As custody determinations depend in large part on the hearing court's assessments of the credibility, character, temperament, and sincerity of the parties, the trial court's determination should be accorded deference, and its determination should not be disturbed unless it lacks a sound and substantial basis in the record. (see Sanchez v Rexhepi, 138 AD3d 869 [2d Dept 2016]. "In matters of this character 'the findings of the nisi prius court must be accorded the greatest respect'" (see Eschbach v Eschbach, 56 NY2d 167 [1982], quoting Matter of Irene O., 38 NY2d 776 [1975]).
Based upon the demeanor and substance of the testimony of both Plaintiff and Dr. Strober, this Court determines both to be credible witnesses whose testimony was found to be honest and forthright. Conversely, Defendant's testimony as set forth in her Affidavit was found to be disingenuous and without credibility. Most importantly, while Defendant alleges that [*16]Plaintiff has engaged in years of serious misconduct involving her and the Children, Defendant has failed to participate meaningfully in this action by failing to timely file papers responsive to Motion Sequence #6 despite being provided an extension to do so or to appear at the Hearing despite having opportunity to do so virtually. Instead, Defendant refers to these proceedings involving the future of the Children as an "unnecessary distraction and stressor," noting that she is "giving up" custody or the Children, appearing to only oppose that portion of Motion Sequence #6 pertaining to the Order of Protection being sought against her. Faced with this fact pattern, the Court must find Defendant not to be a credible witness.
c. Request for Modification of Child Custody
"Modification of a court-approved stipulation setting forth the terms of custody or parental access is permissible only upon a showing that there has been a sufficient change in circumstances such that modification is necessary to ensure the best interests and welfare of the child (see Baraz v Polyakov, 198 AD3d 853, 854 [2021]; Sukul v Sukul, 196 AD3d 661, 662 [2021]). 'The paramount concern when making such a determination is the best interests of the child under the totality of the circumstances' (Matter of Cabano v Petrella, 169 AD3d 901, 902 [2019]; see Eschbach v Eschbach, 56 NY2d 167, 171 [1982]; Baraz v Polyakov, 198 AD3d at 854)" (Burke v Squires, 202 AD3d 784, 786 [2d Dept 2022]).
"Factors to be considered include the relative fitness of the parents, the quality of the home environment, the parents' financial status, the parental guidance given to the child, the ability of each parent to provide for the child's emotional and intellectual development, and the effect an award of custody to one parent might have on the child's relationship with the other parent" (see Hogan v Hogan, 159 AD3d 679 [2d Dept 2018]). "Furthermore, in determining custody, while the express wishes of children are not controlling, they are entitled to great weight, especially where their age and maturity would make their input particularly meaningful" (see Cannella v Anthony, 127 AD3d 745 [2d Dept 2015]). "Entrusting the custody of young children to their parents jointly, especially where the shared responsibility and control includes alternating physical custody, is insupportable when parents are severely antagonistic and embattled." (see Braiman v Braiman, 44 NY2d 584 [1978]).
It is appropriate to consider the impact of domestic violence, if found to exist, on the best interests of the child when making custody determinations (McKinney's DRL § 240(1); Garcia v Scruggs, 44 AD3d 660 [2d Dept 2007]).
It is well established that a natural parent has a claim of custody of his or her child, superior to that of all others, unless the parent has abandoned that right or is proved unfit to assume the duties and privileges of parenthood (see Katherine D. v Christine D., 187 AD2d 587 [2d Dept 1992]).
"A noncustodial parent is entitled to meaningful visitation, and '[d]enial of that right is so drastic that it must be based on substantial evidence that visitation would be detrimental to the welfare of the child' (see Matter of Kachelhofer v Wasiak, 10 AD3d 366 [2004] [internal quotation marks omitted]; see Weiss v Weiss, 52 NY2d 170, 175 [1981]; Matter of Bell v Mays, 127 AD3d 1179, 1180 [2015])" (Izquierdo v Santiago, 151 AD3d 967, 968 [2d Dept 2017].
It has been held that with respect to matters involving religion and citizenship, which form a profound part of a child's heritage and generally do not require daily and immediate intervention by the caretaker parent as those involving education and welfare, absent a compelling showing to the contrary neither parent should be permitted sole decision-making (see [*17]Trapp v Trapp, 136 AD2d 178, 183 [1st Dept 1988]).
This Court finds that due to the parties being severely antagonistic and embattled, it is impossible for the parties to continue joint custody of the Children. The Court determines that the statements made within Defendant's Affidavit, just weeks prior to the Hearing, constitute an affirmative consent to the relief requested pertaining to an award of physical custody of the Children to Plaintiff and final decision-making authority for the Children to Plaintiff. Even absent Defendant's consent, the Court further finds that granting Plaintiff such relief would be within the best interests of the Children. The Court has made this finding based upon review of the relative fitness of the parents, the quality of the home environment, the parents' financial status, the parental guidance given to the Children, the ability of each parent to provide for the Children's emotional and intellectual development, and the effect an award of custody to one parent might have on the Children's relationship with the other parent.
The Court notes first the position of the Children as set forth on the record by the attorney for the Children wherein the Children wish to remain in the physical and legal custody of Plaintiff. The Court affords the Children's position great weight due to their ages and maturity. Additionally, the testimony and evidence received by this Court lead the Court to the conclusion that Plaintiff is a loving father who will provide a stable home environment and will continue to exercise good judgment with respect to the decisions to be made for the Children. Further, the Court is troubled by Defendant's conduct pertaining to the Children which this Court has determined to constitute abandonment, abuse, and neglect of the Children. The Court finds that Defendant's erratic behavior not only warrants that Plaintiff be awarded sole legal and physical custody of the Children, with Plaintiff having sole decision-making for all aspects of the Children's lives including religion and citizenship, but that Defendant's parental access time and communication with the Children be significantly limited as unrestricted exposure of Defendant to the Children would be determinantal to their health, well-being, and general welfare.
Accordingly, based upon the submissions and evidence received by this Court, it is determined that that there has been a sufficient change in circumstances such that modification of the parties' custody and access of the Children is necessary to ensure the best interests and welfare of the Children resulting in the Court granting the relief requested by Plaintiff in the following manner: (1) Plaintiff is hereby awarded sole physical custody of the Children, subject to the parental access of Defendant set forth herein; (2) Defendant's parental access with the Children shall be limited to: (a) supervised therapeutic visitation initiated by the Children; and (b) supervised communication with the Children initiated by the Children; (3) Plaintiff is hereby awarded sole legal custody of the Children whereby he shall be permitted to make all day-to-day and major decisions pertaining to the Children, including but not limited to, education (including school enrollment), extracurricular activities, medical, dental, therapeutic, religious, citizenship or otherwise; and (4) Plaintiff shall be the sole custodian of any passports of the Children issued by any jurisdiction, shall be the only parent permitted to apply for or seek to renew passports of the Children, shall be the only parent permitted to apply for dual citizenship or other citizenship status of the Children and to effectuate this, Defendant shall, within ten (10) days of the Notice of Entry of this Decision, turn over any Passports for the Children and/or documents pertaining to the citizenship of the Children in the possession of Defendant.
d. Request for Relocation
"A parent seeking to relocate with a child bears the burden of establishing by a [*18]preponderance of the evidence that the proposed relocation would be in the child's best interests (see Matter of Tropea v Tropea, 87 NY2d 727, 741 [1996]; Matter of Ventura v Huggins, 141 AD3d 600, 600 [2016]). In determining whether a proposed move is in a child's best interests, courts are 'free to consider and give appropriate weight to all of the factors that may be relevant to the determination' (see Matter of Tropea v Tropea, 87 NY2d at 740). These factors include each parent's reasons for seeking or opposing the move, the quality of the child's relationship with the custodial parent and the noncustodial parent, the impact of the move on the quantity and quality of the child's future contact with the noncustodial parent, the degree to which the child's life may be enhanced economically, emotionally, and educationally by the move, and the feasibility of preserving the relationship between the child and the noncustodial parent through alternate parental access arrangements (see id. at 740—741)" (see Gustave v Harris, 176 AD3d 937 [2d Dept 2019]).
With respect to Plaintiff's request to relocate with the Children to the State of Arizona, the Court recognizes that Defendant has consented to this requested relocation advising the Court that she no longer resides in the State of New York having herself relocated to the country of Hungary. Through their counsel, the Children have also expressed their wishes to relocate as requested by Plaintiff, which the Court affords great weight due to the age and maturity of the Children. The Court has further taken into consideration the testimony of Plaintiff that the Children are flourishing in the State of Arizona since their interim relocation to their new home where they are succeeding in school, enjoying the many friendships they have formed, and surrounded by a number of extended family members.
Accordingly, based upon the submissions and evidence received by this Court, this Court finds that a preponderance of the evidence that the proposed relocation would be in the best interests of the Children and therefore grants Plaintiff authority to permanently relocate with the Children to the State of Arizona.
e. Request for Modification of Child Support Award
A change in a child's residence constitutes a substantial change in circumstances sufficient to warrant suspension of a parent's support obligation (see Froebel v Froebel, 211 AD3d 1577 [4th Dept 2022]; Calderon v Almonte, 158 AD3d 681 [2d Dept 2018] ["The hearing evidence established that there was a substantial change in circumstances, namely, the child moving from the mother's house to the father's house, which justified terminating the father's child support obligation retroactive to the date that the father filed his petition."]). 
The Appellate Division, Second Department has noted the manner in which a party may waive child support:
A valid waiver "'requires no more than the voluntary and intentional abandonment of a known right which, but for the waiver would have been enforceable'" (Golfo v. Kycia Assoc., Inc., 45 AD3d 531, 532, 845 N.Y.S.2d 122, quoting Nassau Trust Co. v. Montrose Concrete Prods. Corp., 56 NY2d 175, 184, 451 N.Y.S.2d 663, 436 N.E.2d 1265; see Gresser v. Princi, 128 AD2d 752, 753, 513 N.Y.S.2d 462). It may arise by either an express agreement or by such conduct or failure to act as to evince an intent not to claim the purported advantage (see Hadden v. Consolidated Edison Co. of NY, 45 NY2d 466, 469, 410 N.Y.S.2d 274, 382 N.E.2d 1136; Cashin v. Cashin, 79 AD3d 963, 913 N.Y.S.2d 321; Cotton v. Cotton, 76 AD3d 1041, 908 N.Y.S.2d 133). A waiver "is not created by negligence, oversight, or thoughtlessness, and cannot be inferred from [*19]mere silence" (Peck v. Peck, 232 AD2d 540, 540, 649 N.Y.S.2d 22). Rather, there must be proof that there was a voluntary and intentional relinquishment of a known and otherwise enforceable right (see id.). "'[T]he party claiming a waiver must come forward with evidence of a voluntary and intentional relinquishment of a known and otherwise enforceable right to child support'" (Matter of Tafuro v. Tafuro, 102 AD3d 877, 878, 958 N.Y.S.2d 202, quoting Stevens v. Stevens, 82 AD3d 873, 873, 918 N.Y.S.2d 879; see Matter of Barrio v. Montanez, 71 AD3d 1140, 1140, 896 N.Y.S.2d 905; Matter of O'Connor v. Curcio, 281 AD2d 100, 105, 724 N.Y.S.2d 171)."
(Hinck v Hinck, 113 AD3d 681 [2d Dept 2014]).
Based on the evidence provided, the Court has determined that a change of residence of the Children occurred prior to the date of Plaintiff's filing Motion Sequence #6, being January 10, 2024, and that the Children's change of residence from residing with Defendant to residing with Plaintiff constituted a substantial change in circumstances warranting a modification of Plaintiff's child support obligations payable to Defendant and triggering the need for the Court to determine the appropriate amount of child support to be payable from Defendant to Plaintiff.
However, despite Plaintiff requesting an award of child support for the Children within Motion Sequence #6, his testimony during the Hearing included a waiver of such award. While the Court would not permit such a waiver to proceed without further inquiry to insure that the needs of the Children are adequately being met, the Court takes judicial notice of the parties' Stipulation of Settlement admitted into evidence at the Hearing as Plaintiff's Exhibit #2 which in Article V recites Plaintiff's then-annual income as defined in the Child Support Standards Act (hereinafter referred to as the "CSSA") as $1,463,000.00 and the mother's then-annual income as defined in the CSSA as $84,000.00. Due to Plaintiff's significant annual income, the Court will accept Plaintiff's waiver of child support from Defendant having determined that Plaintiff has adequate financial resources to care for the Children's needs without the financial assistance of Defendant that a child support award would afford.
Accordingly, based upon the submissions and evidence received by this Court, this Court determines that as a substantial change in circumstances sufficient to warrant termination of a Plaintiff's child support obligation to Defendant, as of January 10, 2024, has occurred being the change in residence of the Children from the residence of Defendant to the residence of Plaintiff. The Court further determines that Plaintiff has engaged in a waiver of an award of child support from Defendant to Plaintiff pertaining to the Children and that such waiver has been a voluntary and intentional relinquishment of a right to a child support award by Plaintiff, resulting in the Court not taking any further action to determine the amount of child support that would be due from Defendant to Plaintiff for the Children pursuant to the CSSA without prejudice of Plaintiff to request child support in the future.
f. Request for Other Relief
Any relief specifically not granted or otherwise addressed herein is denied.

 * * *

Based upon the foregoing, it is hereby
ORDERED that Plaintiff is hereby awarded sole physical custody of the Children H.V.L. (DOB: XX/XX/2012) and C.B.L. (DOB: XX/XX/2015), subject to the parental access of [*20]Defendant set forth herein; and it is further
ORDERED that Defendant's parental access with the Children H.V.L. (DOB: XX/XX/2012) and C.B.L. (DOB: XX/XX/2015) shall be limited to: (a) supervised therapeutic visitation initiated by the Children H.V.L. (DOB: XX/XX/2012) and C.B.L. (DOB: XX/XX/2015); and (b) supervised communication with the Children initiated by the Children H.V.L. (DOB: XX/XX/2012) and C.B.L. (DOB: XX/XX/2015); and it is further
ORDERED that Plaintiff is hereby awarded sole legal custody of the Children H.V.L. (DOB: XX/XX/2012) and C.B.L. (DOB: XX/XX/2015) whereby he shall be permitted to make all day-to-day and major decisions pertaining to the Children H.V.L. (DOB: XX/XX/2012) and C.B.L. (DOB: XX/XX/2015), including but not limited to, education (including school enrollment), extracurricular activities, medical, dental, therapeutic, religious, citizenship or otherwise; and it is further
ORDERED that Plaintiff shall be the sole custodian of any passports of the Children H.V.L. (DOB: XX/XX/2012) and C.B.L. (DOB: XX/XX/2015) issued by any jurisdiction, shall be the only parent permitted to apply for or seek to renew passports of the Children H.V.L. (DOB: XX/XX/2012) and C.B.L. (DOB: XX/XX/2015), shall be the only parent permitted to apply for dual citizenship or other citizenship status of the Children H.V.L. (DOB: XX/XX/2012) and C.B.L. (DOB: XX/XX/2015) and to effectuate this Defendant shall within ten (10) days of the Notice of Entry of this Decision turn over any Passports for the Children H.V.L. (DOB: XX/XX/2012) and C.B.L. (DOB: XX/XX/2015) and/or documents pertaining to the citizenship of the Children H.V.L. (DOB: XX/XX/2012) and C.B.L. (DOB: XX/XX/2015) in the possession of Defendant; and it is further
ORDERED that Plaintiff is granted the authority to permanently relocate with the Children to the State of Arizona.; and it is further
ORDERED the child support provision of the Stipulation of Settlement, dated February 14, 2018, obligating Plaintiff to make monthly child support payments to Defendant, are vacated as of January 10, 2024; and it is further
ORDERED that as Plaintiff has made a waiver of an award of child support from Defendant for the Children H.V.L. (DOB: XX/XX/2012) and C.B.L. (DOB: XX/XX/2015), which the Court has accepted, no award of child support shall be made by this Court without prejudice of Plaintiff to make an application for an award of child support in the future; and it is further
ORDERED that Plaintiff shall serve this Decision and Order with Notice of Entry on Defendant within twenty (20) days of the date of this Decision and Order, and shall file an Affidavit of Service within twenty (20) days of the date of this Decision and Order; and it is further
ORDERED that to the extent any relief sought has not been granted, it is expressly denied.
The foregoing constitutes the Decision and Order of the Court. 
Dated: April 5, 2024
White Plains, New York
ENTER:
HON. JAMES L. HYER, J.S.C.