PETER J. R. TRAPP, Respondent, v REGINA A. TRAPP, Appellant.

First Department, March 24, 1988

## APPEARANCES OF COUNSEL

*Jeffrey Berke* of counsel *(Peter J. Unger* with him on the brief; *Alfieri, Frohman, Unger & Primoff,* attorneys), for respondent.

*Carlos Ricca* of counsel *(Joel S. Sankel* with him on the brief; *Sankel & Skurman,* attorneys), for appellant.

**OPINION OF THE COURT**

SULLIVAN, J.

This appeal is from a modification of a judgment of divorce to provide for joint decision-making over the upbringing of the three infant children of the marriage concerning a host of items such as choice of schools, psychological or psychiatric treatment, counseling, doctors and surgeons, religion and citizenship. Since the parents continue to be severely antagonistic towards each other, such an arrangement is, in our view, fraught with the potential for further and continuing discord and, thus, is inimical to the best interests of the children. Accordingly, we limit the joint decision-making arrangement to religion and citizenship only, and modify accordingly.

Under the original terms of the stipulation of settlement, incorporated by reference into the judgment of divorce, the wife was granted custody of the children, Sophia, age 16, Alexander, age 12, and Olivia, age 9, subject to visitation by the husband, as expressly provided. By their own admission, the parties are wealthy and live in relative comfort.

The divorce proceeding has been marked by the inability of the parties, who barely speak to each other, to agree on any issue without resort to the judicial forum. In the almost four years since the commencement of these proceedings, in addition to two Family Court actions, there have been approximately 30 motions and cross motions which, aside from those relating to the husband's repeated failure to pay maintenance and child support and to comply with discovery demands, have included such issues as the husband's refusal to permit Sophia, as a prelude to preparatory school, to study in Zermatt, Switzerland, where members of the wife's family still reside, as the wife, the child's school authorities and her psychologist had recommended. The issue was ultimately resolved in Sophia's favor, but only after protracted judicial proceedings, which apparently have had an adverse effect on the child. While Sophia's grades had suffered during the pendency of the divorce proceedings, her school work improved in Zermatt. In any event, regardless of the basis of his objection to the Zermatt school, it is alleged, and the husband does not deny, that he never accompanied Sophia to visit any of the preparatory schools in which she expressed an interest, or looked at any school catalogue. He has never inquired as to her preferences, and refuses even to consider any school suggested by the wife.

On other occasions, the husband failed to pay doctor bills and, even after being directed to do so by court order, refused to cooperate in the filing of medical insurance forms. He refused to permit one of the children to be evaluated for camp by the physician who had examined the child annually for six years before the commencement of the divorce proceedings, apparently because he thought the physician was allied with the wife. On another occasion, after stipulating that he would return the children's passports, he refused to do so, thereby jeopardizing the children's vacation plans. Again, judicial intervention was necessary. After one of their visits he refused to return the children's ski equipment and clothing, which the wife had to replace. He advised the children's school officials that any mail concerning them should be sent only to him.

Thirty-six hours before the wife was about to leave on a spring vacation with the children after giving him at least one month's notice, the husband, without any advance warning, obtained a court order allowing him to take the children on a ski vacation. Court intervention was also required when the husband refused to sign a letter required by the authorities in Mexico before the wife would be permitted to take the children to that country on a vacation.

After the wife sold her New York City apartment and purchased a home in Millbrook, New York, near where her husband lived, she decided to enroll the children in the Dutchess Day School, a private school only 10 minutes away. The husband insisted that the children attend the Indian Mountain School, which was 45 minutes away and inaccessible by private or public transportation. The wife believed that attendance at Indian Mountain would also frustrate the children's efforts to make friends locally. As recently as the summer of 1987, on the only weekend on which visits were allowed at the son's summer camp, the husband deliberately thwarted the wife's visit after she had made a four-hour trip, by secreting the child at a neighbor's house.

Joint legal custody, or joint decision-making, as the husband characterizes it, is to be distinguished from joint physical custody, where the children live alternatively with both parents. In joint legal custody, which is the case here, although the children actually live with only one parent, both parents continue to share the same rights and responsibilities as they did during the marriage to participate in the decisions affecting their children. In this situation, the day-to-day child-rear-

ing decisions are made by the parent with whom the children are living, while decisions with respect to the important issues, such as religious training, education and medical care, and sometimes even less significant matters, such as discipline, diet and the choice of a summer camp, are jointly made. *(See, Why Joint Custody Doesn't Always Work,* July 1984 Changing Times, at 59; *see also,* Skoloff, *Joint Custody: A Jaundiced View,* March 1984 Trial, at 52-53.) In any event, both arrangements constitute a form of joint custody. As the court in *Dodd v Dodd* (93 Misc 2d 641, 644-645) recognized, "[T]here has been no uniform application of the term 'joint custody' and no single arrangement which results when a joint award is made."

The benefits and shortcomings of joint custody have been widely debated. *(See, Dodd v Dodd, supra,* 93 Misc 2d, at 645-647, for a collection of authorities; *see also,* 2 Foster, Freed and Brandes, Law and the Family—New York § 29:6A, at 674-694 [Feb. 1987 Cum Supp]; Bodenheimer, *Progress Under the Uniform Child Custody Jurisdiction Act and Remaining Problems: Punitive Decrees, Joint Custody, and Excessive Modifications,* 65 Cal L Rev 978, at 1009-1010; *see generally,* Annotation, *"Split", "Divided", or "Alternate" Custody of Children,* 92 ALR2d 695.) Joint custody, it has been noted, "is encouraged primarily as a voluntary alternative for relatively stable, amicable parents behaving in mature civilized fashion". *(Braiman v Braiman,* 44 NY2d 584, 589-590.) Joint custody has been rejected where the "parties are unable to communicate and make rational, joint decisions on matters relating to the care and welfare of the children." *(Matter of Bishop v Lansley,* 106 AD2d 732, 733.) "As a court-ordered arrangement imposed upon already embattled and embittered parents, accusing one another of serious vices and wrongs, [joint custody] can only enhance familial chaos." *(Braiman v Braiman, supra,* at 590.)

The motion court conceded that the parties "had gone through hard problems" in their divorce proceedings. Nevertheless, it still believed that they had to cooperate on decisions affecting the children. In our view, where the parties cannot agree on even the simplest of issues, they cannot reasonably be expected eventually to agree on the major areas of concern affecting the children. Joint decision-making cannot be forced on hostile and antagonistic parents. As this record discloses, the husband has never shown a capacity for compromise and has litigated virtually every child-rearing issue that has arisen since the commencement of these proceedings.

In *Braiman,* the court made the following observation: "In the rare case, joint custody may approximate the former family relationships more closely than other custodial arrangements. It may not, however, be indiscriminately substituted for an award of sole custody to one parent. Divorce dissolves the family as well as the marriage, a reality that may not be ignored. In this case the gross conflict between the parents is so embittered and so involved with emotion and litigation that between them joint custody is perhaps a Solomonic approach, that is, one to be threatened but never carried out" *(supra,* 44 NY2d, at 591).

The *Braiman* rationale has been consistently followed. In *Matter of Worowski v Worowski* (95 AD2d 687), in holding that it was an abuse of discretion to grant joint custody against a background of continuing marital turmoil, this court stated, "joint custody is not favored where the parents are severely antagonistic and embattled" (citing *Braiman v Braiman, supra).* In *Stanat v Stanat* (93 AD2d 114, 116, *lv denied* 59 NY2d 605), the court commented that joint custody "seems to be one of those ideas which are often quite attractive at a distance, but not quite so, when viewed close up." In upholding the trial court's award of primary custody to the mother but finding the placing of joint decision-making in both parents to be inappropriate, the Court of Appeals stated: "[T]he existence of sharp differences between the parties makes an award of joint custody inappropriate. Such shared responsibility for and control of the child's upbringing is not properly ordered where, as here, the parents have evidenced an inability to cooperate on matters concerning the child". *(Bliss v Ach,* 56 NY2d 995, 998.)

Similarly, in *Seago v Arnold* (91 AD2d 835, *lv dismissed* 59 NY2d 761), the parties had stipulated that the mother would have physical custody of the children, but that custody would be "joint" and "mutual". In light of the disputatious conduct between the parties, the Family Court awarded sole and absolute custody to the mother. The Fourth Department found that there had not been any abuse of discretion because the hostility between the parties precluded joint decision-making: "When disruption of the marital state occurs, the state of repose represented by joint custody is generally a voluntary alternative 'for relatively stable, amicable parents behaving in mature civilized fashion' * * * The parties herein voluntarily agreed to such an arrangement, but based upon this record it is clear that a style of shared responsibility cannot survive.

That both parties are fit and love their children is not questioned, but the obvious hostility between them, demonstrated in part by regular litigation instituted by petitioner, makes the arrangement inappropriate" (supra, 91 AD2d, at 836).

On this record, it is obvious that the parents cannot jointly decide issues affecting their children, and that joint custody as ordered here would only work a disservice to the children. Although the record indicates that the problem is the husband's recalcitrance, the question of fault is beside the point. The inescapable fact is that the parents cannot agree.

The motion court's decision would consign the parents and children to never-ending litigation over every major decision that had to be made affecting the children, who, in turn, would be needlessly placed in a constant state of uncertainty and confusion as to their plans and continuously burdened with the concern that they were aggravating the already existing animosity between the parents. As the authors of Foster, Freed and Brandes, Law and the Family—New York have noted, joint custody "is of doubtful psychological validity since it ignores the 'double bind' in which the child may be placed and the potential conflict in loyalties. Most child psychologists and psychiatrists and other experts in child development are opposed to joint custody unless perhaps there are extraordinary circumstances" (vol 2, at 674 [Feb. 1987 Cum Supp]). Finally, in the circumstances presented, joint custody would place the court in the unenviable role of ultimate arbiter of every fundamental child-rearing issue.

We do, however, believe that a distinction should be made between matters involving religion and citizenship, which form a profound part of a child's heritage and generally do not require daily and immediate intervention by the caretaker parent, and those involving education and welfare. Absent a compelling showing to the contrary, not present here, we do not believe that the sole decisional authority as to the children's religion and citizenship ought to be reposed in either parent. Thus, we leave untouched the provision for joint decision-making as to those two matters.

Accordingly, the order and judgment (one paper) of the Supreme Court, New York County (Carmen Beauchamp Ciparick, J.), entered July 17, 1987, should be modified, on the law and on the facts, and in the exercise of discretion, to the extent of vacating the provision for joint decision-making as to the children with regard to the choice or change of schools,

college or camps and psychological or psychiatric treatment or counseling, doctors or surgeons and, except as thus modified, affirmed, without costs or disbursements.

SANDLER, J. P., CARRO and SMITH, JJ., concur.

Order, Supreme Court, New York County, entered on July 17, 1987, unanimously modified, on the law and on the facts, and in the exercise of discretion, to the extent of vacating the provision for joint decision-making as to the children with regard to the choice or change of schools, college or camps and psychological or psychiatric treatment or counseling, doctors or surgeons and, except as thus modified, affirmed, without costs and without disbursements.