K.S. v J.S. (2024 NY Slip Op 51418(U))

[*1]

K.S. v J.S.

2024 NY Slip Op 51418(U)

Decided on October 15, 2024

Supreme Court, Putnam County

Grossman, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on October 15, 2024
Supreme Court, Putnam County

K.S., Plaintiff,

against
J.S., Defendant.

Index No. XXXXX

Plaintiff is represented by Faith Miller, and Tiffany E. Gallo from the firm of Miller Zeiderman, 140 Grand Street, 5th Floor, White Plains, NY 10601
Defendant is represented by Matthew C. Kesten from the firm of Schwartz Sladkus Reich Greenberg Atlas LLP, 444 Madison Avenue, New York, NY 10022 and Stamatia Dewbury, Dewbury & Associates 53 Gleneida Ave., Carmel, NY 10512

Victor G. Grossman, J.

The following papers numbered 1 to 7 were read on Defendant's application for a declaration construing the parties' oral stipulation, made in open court on June 25, 2024, relative to the custody of their minor children:
Order to Show Cause — Affirmations (2) / Exhibits 1-3
Affirmations in Opposition (2) / Exhibits 4-5
Reply Affirmations (2) / Exhibit 6-7
Upon the foregoing papers it is ORDERED that the application is disposed of as follows:
THE STIPULATION
This is a contested matrimonial action. On June 25, 2024, the parties placed an oral stipulation ( the "Stipulation") relative to the custody of their two young children on the record in open court. The transcript of the proceeding was "so ordered" by the Court. So far as pertains to the dispute presently before the Court, the transcript states as follows:
Ms. Gallo: Your Honor, I believe that we reached a settlement based on what the AFC has told us . . . .I do believe that we can probably put the bullet points of the settlement on the record, but it will be subject to a complete custody and access stipulation that we would then ask the Court to so order
.....
The Court: Is it the parties' intention that the bullet points will be controlling unless or until a formal document is executed?
Ms. Gallo: Yes, Your Honor.
The Court: Okay. Is that your understanding as well?
Ms. Dewbury: Yes, Your Honor.
The Court: All right. And, Mr. Deurso, is that your understanding as well?
Mr. Deurso: Yes, Judge, that's my understanding.
Ms. Gallo: The parties in this matter will have joint legal custody of the two minor children, L.S. and Lu. S. The parties are going to utilize John Pappalardo as a parent coordinator solely for major decisions of health, education and religion . . . .There will also be — the parties will be guided by the recommendation of the PC in making major decisions. And the party who the PC is in agreement with will be able to implement their decision subject to the other party's right to seek a stay from a court of competent jurisdiction . . . .With respect to the residential custody of the children, the Plaintiff will have primary residential custody of the children subject to the Defendant's access schedule with the children which will be as follows: . . . .
(Transcript, June 25, 2024, pp. 4-6)
DEFENDANT'S APPLICATION
Plaintiff thereafter took unilateral action with respect to the children which Defendant claims violated his rights under the Stipulation as a parent enjoying joint legal custody of the children. Defendant in consequence filed the present application for an order as follows:
1. Declaring and/or directing that the parties' June 25, 2024 joint custody agreement, which was "So Ordered" by this Court:
(a) requires the parties to engage in good faith consultation (email exchanges to suffice) regarding all important or major decisions (hereinafter "Major Decisions") concerning the parties' two minor children . . . prior to the [i] submission of unresolved Major Decisions related to the health, education and religion of/for the Children to the parties' agreed on parent coordinator; and [ii] implementation of any other Major Decisions concerning the Children;
(b) precludes either party from unilaterally implementing any Major Decisions absent the issuance of a recommendation by the parties' agreed on parent coordinator (related to the health, education and religion of/for the Children) or without the express written consent or agreement of the other party regarding any other Major Decisions concerning the Children;
2. Declaring that Major Decisions concerning the Children include health, education and religious decisions of the Children, as well as decisions or issues relating to dental, therapeutic, psychiatric, extracurricular activities (both school related and activities unrelated to school), summer camp, summer programs, day care, day care facilities, and tutoring of/for the Children;
3. Declaring that if either party unilaterally implements any Major Decisions concerning the Children without the express written consent of the other party or the issuance of a recommendation by the parties' agreed on parent coordinator with regard to health, education and religious decisions concerning the Children, the other party shall not be required to contribute to the cost of any unilaterally implemented Major Decisions . . .
Plaintiff in opposition asserts that the Stipulation unambiguously restricts "Major Decisions" to those concerning "health, education and religion."
LEGAL ANALYSIS
A. The Construction of Matrimonial Settlement Agreements
A matrimonial settlement agreement is a contract subject to principles of contract interpretation. See, Rainbow v. Swisher, 72 NY2d 106, 109 (1988). The rule applies to oral stipulations placed on the record in open court: "[a]n oral stipulation of settlement that is made in open court . . . is enforceable as a contract and is governed by general contract principles for [*2]its interpretation and effect; [t]he role of the court is to determine the intent and purpose of the stipulation based on an examination of the record as a whole." Scherer v. North Shore Car Wash Corp., 72 AD3d 927, 929 (2d Dept. 2010); Koppie v. Koppie, 62 AD3d 666, 667 (2d Dept. 2009); Flannery v. Flannery, 54 AD3d 804 (2d Dept. 2008).
The plain text of the agreement is the best source of the parties' intent. See, Goldman v. White Plains Center for Nursing Care, 11 NY3d 173, 176 (2008); Burns v. Burns, 163 AD3d 210, 213 (4th Dept. 2018). "Where . . . the contract is clear and unambiguous on its face, the intent of the parties must be gleaned from within the four corners of the instrument, and not from extrinsic evidence (Nichols v. Nichols, 306 NY 490, 496 . . . )." Rainbow v. Swisher, supra, 72 NY2d at 109. 
B. The Parties' Positions
Here, however, the parties offer conflicting interpretations of the Stipulation.
According to Defendant:
The parties in this matter agreed to share joint legal custody of the Children. Neither has final decision-making authority and neither has the unilateral right to implement any important or major decisions regarding the children . . . [J]oint legal custody encompasses more than only the health, education and religious decisions that the parties agreed to submit to a parenting coordinator in the absence of an agreement between themselves.
(Kesten Aff. ¶¶ 2, 3)
Plaintiff is wrong in even suggesting that the parties' agreed that "health, education and religion" are the only "major decisions" that exist or require joint decisions. They are simply the only categories of major issues for which the parties made alternate or tie breaking resolution arrangements if they were unable to mutually agree on a decision relating to those three categories on their own.
(Kesten Reply Aff. ¶4)
According to Plaintiff:
Defendant's contention that the Stipulation only prescribes which Major Decisions will be submitted to the Parent Coordinator and does not actually define the ambit of Major Decisions in general is not accurate. The Parties agreed that the Parent Coordinator would be used to resolve Major Decisions regarding health, education and religion on which the Parties could not agree and intentionally limited the scope of those decisions to those three (3) specific categories. Defendant's argument that entire unidentified swathes of Major Decisions could exist (and that they are without any mechanism for resolution) defies logic.
(Gallo Aff. ¶9)
The very nature of family matters is highly discretionary, individualized, and flexible and there is no statutory definition of what constitutes a Major Decision or, for that matter, even joint legal custody . . . The purpose of designating Major Decisions (and attendant dispute resolution mechanisms) is to distinguish a subset of particularly consequential decisions that require a greater degree of coordination and input between divorced parents. Doing so accomplishes the dual purpose of ensuring that both parents are involved in making the most significant types of decisions while also exempting the dozens of less significant decisions from time consuming and conflict-inducing back and forth.
(Gallo Aff. ¶¶ 15, 16)
C. A Literal Reading of the Stipulation
On a purely literal reading of the language of the Stipulation, it would appear that Defendant has the better of the textual argument. The critical language, once again, is:
The parties in this matter will have joint legal custody of the two minor children, L.S. and Lu.S. The parties are going to utilize John Pappalardo as a parent coordinator solely for major decisions of health, education and religion . . . .
The parties by this language agreed to "joint legal custody" without qualification, i.e., without delimitation of the areas of the children's life to which it applies. That they agreed to use a PC "solely for major decisions of health, education and religion" is naturally read, as Defendant suggests, as carving out a subset of issues for reference to the PC when the parents reach an impasse.
D. Construction in the Event of Ambiguity
Plaintiff's view — that providing a mechanism of resolution "solely for major decisions of health, education and religion" effectively limited the scope of "joint legal custody" — goes beyond the literal language of the Stipulation and rests on an argument that given the fluid and ill-defined nature of such things as "family matters", "joint legal custody", and "major decisions", it "defies logic" to suggest that the parties would go to the trouble of specifying a mechanism of resolution for only a subset of the major decisions on which the parents could disagree under a regime of joint legal custody. If and to the extent that Plaintiff's interpretation gives rise to an ambiguity requiring resort to extrinsic aids to reach a proper construction of the Stipulation, it invites consideration of the law of "joint legal custody", which was certainly present to the minds of practitioners as learned and astute as those representing the parties herein.
In Dolman v. United States Trust Co. of NY, 2 NY2d 110 (1956), the Court of Appeals wrote:
[I]t is basic that, unless a contract provides otherwise, the law in force at the time the agreement is entered into becomes as much a part of the agreement as though it were expressed or referred to therein, for it is presumed that the parties had such law in contemplation when the contract was made and the contract will be construed in the light of such law.
Id., 2 NY2d at 116. Elaborating on Dolman, the Fourth Department has written:
The Dolman rule is of longstanding vintage, and the "principle embraces alike those [laws in force at the time of a contract's execution] which affect its validity, construction, discharge, and enforcement" (Von Hoffman v. City of Quincy, 71 U.S. (4 Wall.) 535, 550 . . . [1866] [italics added in Burns]. By virtue of the Dolman rule, when parties enter into an agreement authorized by or related to a particular statutory scheme, the courts will presume — absent something to the contrary — that the terms of the agreement are to be interpreted consistently with the corresponding statutory scheme [cit.om.].
Burns v. Burns, supra, 163 AD3d at 214. Broaching the issue from the perspective of the parties' reasonable expectations, the First Department has observed:
Besides the common meaning of the language employed, the expectations and purposes of the parties in view of the factual context in which the agreement was made must be considered in interpreting a contract term, with due regard to the parties' sophistication [cit.om.]. With respect to reasonable expectations, it is axiomatic that the parties to an agreement will interpret the instrument governing their relationship in accordance with [*3]existing law [cit.om.].
Madison Avenue Leasehold, LLC v. Madison Bentley Associates LLC, 30 AD3d 1, 8 (1st Dept. 2006).
E. Construction of the Stipulation in Light of the Law of Joint Legal Custody
There are two salient points to be made concerning "joint legal custody", the first having to do with its meaning and scope, the second having to do with the circumstances wherein it may appropriately be implemented.
"Joint custody . . . reposes in both parents a shared responsibility for and control of a child's upbringing." Braiman v. Braiman, 44 NY2d 584, 589 (1978); Matter of Argila v. Edelman, 174 AD3d 521, 523 (2d Dept. 2019). In Trapp v. Trapp, 136 AD2d 178 (1st Dept. 1988), the First Department elaborated on the concept:
In joint legal custody . . . although the children actually live with only one parent, both parents continue to share the same rights and responsibilities as they did during the marriage to participate in the decisions affecting their children. In this situation, the day-to-day child rearing decisions are made by the parent with whom the children are living, while decisions with respect to the important issues, such as religious training, education and medical care, and sometimes even less significant matters, such as discipline, diet and the choice of a summer camp, are jointly made. [cit.om.]. 
Trapp, supra, 136 AD2d at 180-181. See, Tippins, New York Matrimonial Law and Practice, Vol. 3, §21.2, p. 205 (2021) ("Joint custody, to work effectively, requires that the parents be able to consult and agree upon decisions of major import to the lives of their children. At a minimum, such decisions typically encompass medical, religious, and educational issues." [emphasis added]). As the Trapp Court pointedly observed, "there has been no uniform application of the term 'joint custody' and no single arrangement which results when a joint award is made." Id., at 181 (quoting Dodd v. Dodd, 93 Misc 2d 641, 644-645 [Sup. Ct. NY Co. 1978]). See also, Taylor v. Taylor, 306 Md. 290, 296, 508 A.2d 964, 967 (Md. 1986) ("Legal custody carries with it the right and obligation to make long range decisions involving education, religious training, discipline, medical care, and other matters of major significance concerning the child's life and welfare" [emphasis added]).
A number of states have enacted statutes defining joint legal custody. Thus:
• Cal.Fam.Code §3003: " 'Joint legal custody' means both parents shall share the right and the responsibility to make the decisions relating to the health, education, and welfare of a child."
• Ga.Code Ann. §19-9-6(5): " 'Joint legal custody' means both parents have equal rights and responsibilities for major decisions concerning the child, including the child's education, health care, extracurricular activities, and religious training; provided, however, that the judge may designate one parent to have sole power to make certain decisions while both parents retain equal rights and responsibilities for other decisions."
• Idaho Code §32-717B(3): " 'Joint legal custody' means a judicial determination that the parents or parties are required to share the decision-making rights, responsibilities and authority relating to the health, education and general welfare of a child or children."
• Mass.Gen.Laws.Ann. 208 §31: " 'Shared legal custody', continued mutual responsi-bility and involvement by both parents in major decisions regarding the child's welfare including matters of education, medical care and emotional, moral and religious development."
• Mich.Comp.Laws.Ann. §722.26a(7): "As used in this section, 'joint custody' means an order of the court in which one or both of the following is specified: (a) That the child shall reside alternately for specific periods with each of the parents. (b) That the parents shall share decision-making authority as to important decisions affecting the welfare of the child.
• Minn.Stat.Ann. §518.003(3)(b): " 'Joint legal custody' means that both parents have equal rights and responsibilities, including the right to participate in major decisions concerning the child's upbringing, including education, health care, and religious training."
• Miss.Code.Ann. §93-5-24(5)(e): "For the purposes of this section, 'joint legal custody' means that the parents or parties share the decision-making rights, the responsibilities and the authority relating to the health, education and welfare of a child. An award of joint legal custody obligates the parties to exchange information concerning the health, educa-tion and welfare of the minor child, and to confer with one another in the exercise of decision-making rights, responsibilities and authority.
• Vernon's.Ann.Missouri Stat. §452.375(1)(2): " 'Joint legal custody' means that the parents share the decision-making rights, responsibilities, and authority relating to the health, education and welfare of the child, and, unless allocated, apportioned, or decreed, the parents shall confer with one another in the exercise of decision-making rights, responsibilities, and authority."
• N.J.S.A. §9:2-4(a): "In any proceeding involving the custody of a minor child, the rights of both parents shall be equal and the court shall enter an order which may include (a) Joint custody of a minor child to both parents, which is comprised of legal custody or physical custody which shall include . . . (2) provisions for consultation between the parents in making major decisions regarding the child's health, education and general welfare."
• New.Mex.Stat.Ann. §40-4-9.1(J)(3, 4): "An award of joint custody means that . . . (3) the parents shall consult with each other on major decisions involving the child before imple- menting those decisions; that is, neither parent shall make a decision or take action which results in a major change in the child's life until the matter has been discussed with the other parent and the parents agree." The "major changes" referenced in subdivision "4" are: changes in home city or state of residence; changes in religious denomination and religious activities; type of education, public or private; major elective medical or dental treatment; and changes in recreational activities.
• Oregon.Rev.Stat. §107.169(1): "As used in this chapter, 'joint custody' means an arrangement by which parents share rights and responsibilities for major decisions concerning the child, including, but not limited to, the child's residence, education, health care and religious training."
• S.Dak.Cod.Laws §25-5-7.1: "In any custody dispute between parents, the court may order joint legal custody so that both parents retain full parental rights and responsi-bilities with respect to their child and so that both parents must confer on, and participate in, major decisions affecting the welfare of the child . . . .If it appears to the court to be in the best interest of the child, the court may order, or the parties may agree, how any such responsibility shall be divided. Such areas of responsibility may include the child's primary physical residence, child care, education, extracurricular activities, medical and dental care, religious instruction, the child's use of motor vehicles, and any other [*4]responsibilities which the court finds unique to a particular family or in the best interest of the child . . . ."
• Vermont.Stat.Ann. §664(1)(A): " 'Legal responsibility' means the rights and responsi-bilites to determine and control various matters affecting a child's welfare and upbringing other than routine daily care and control of the child. These matters include but are not limited to education, medical and dental care, religion and travel arrangements. Legal responsibility may be held solely or may be divided or shared."
• Wisc.Stat. §767.001(2): " 'Legal custody' means . . . the right and responsibility to make major decisions concerning the child, except with respect to specified decisions as set forth by the court or the parties in the final judgment or order . . . 'Major decisions' includes, but is not limited to, decisions regarding consent to marry, consent to enter military service, consent to obtain a motor vehicle operator's license, authorization for nonemergency health care and choice of school and religion." The foregoing caselaw and statutory authority teaches that while shared responsibility for major decisions concerning a child's religion, education and health is at the core of joint legal custody, those three categories do not exhaust the areas of a child's life that may be subject to consultation and mutual decision-making by parents under a joint custody arrangement.
In New York, mutual control over issues pertaining to religion / education / health would, as Professor Tippins notes, constitute a minimal version of joint legal custody. See also, Trapp v. Trapp, supra. However, New York courts, as Defendant aptly observes, often interpret joint legal custody more broadly, not only by taking an expansive view of what falls under the rubric of "education" or "health", but also by including, for example, such things as extracurricular activities and summer camp. See, Chamberlain v. Chamberlain, 24 AD3d 589, 593 (2d Dept. 2005); Winslow v. Winslow, 205 AD2d 620 (2d Dept. 1994); Wideman v. Wideman, 38 AD3d 1318 (4th Dept. 2007); A.F. v. T.F., 83 Misc 3d 1228(A) (Sup. Ct. Westchester Co. 2024); D.A. v. C.A., 83 Misc 3d 1214(A) (Sup. Ct. Westchester Co. 2024); N.F. v. O.F., 82 Misc 3d 1240(A) (Sup. Ct. Westchester Co. 2024); M.R. v. A.D., 32 Misc 3d 1512 (Sup. Ct. NY Co. 2011). Other states by statute codify a broad view of joint legal custody by means of the definition of major decisions which require consultation and mutual decision-making: in many cases by incorporating such all-encompassing terms as the child's "welfare" or "general welfare", in others by adding to religion / education / health such other categories as extracurricular activities, change of residence, change of recreational activities, child care, travel arrangements, and/or use of motor vehicles.
Thus, when the parties agreed to joint legal custody of their two minor children without explicit definition or limitation, they may prima facie be deemed to have intended a regime of mutual decision-making on a scale reflected in the law, as summarized above.
However, that does not conclude the analysis. In Matter of Hreat v. Hreat, 189 AD3d 1237 (2d Dept. 2020), the Second Department, quoting Braiman v. Braiman, supra, wrote:
"[J]oint custody is encouraged primarily as a voluntary alternative for relatively stable, amicable parents behaving in mature civilized fashion" (Braiman v. Braiman, 44 NY2d 584, 589-590 [1978]). "However, joint custody is inappropriate where the parties are antagonistic toward each other and have demonstrated an inability to cooperate on matters concerning the child" (Matter of Gorniok v. Zeledon-Mussio, 82 AD3d 767, 768 [2011] . . . ).
Hreat, supra, 189 AD3d at 1238. See, Trapp v. Trapp, supra, 136 AD2d at 181 (same). See also, Tippins, New York Matrimonial Law and Practice, Vol. 3, §§ 21.2-21.4, pp. 204-217 [*5](2021). Professor Tippins takes a markedly cynical view of the prospects of joint legal custody for success. He observes inter alia:
• "[Joint legal custody] was a nice 'touchy-feely' ring to it and is often touted as a potential panacea to the deadly disorders which commonly emerge from a custody contest. Unfor-tunately, like so many altruistic alternatives postulated in the realm of domestic relations, joint custody is often more appealing on paper than it is workable in the heat of a family fray." Id., at 204.
• "Joint custody, to work effectively, requires that the parents be able to consult and agree upon decisions of major import to the lives of their children . . . This sharing of the decision-making process is at once the hallmark and the downfall of joint custody as a practical solution to many custody disputes. It is often quipped within the matrimonial bar that if the parties could get along well enough to navigate such choppy custodial waters, they would not have needed to divorce in the first place. While this aphorism may be overstated, practice experience indicates that it is a rare couple who can transcend the incidents of their own estrangement and effectuate postdivorce coparenting in a meaningful and amicable way. Id., at 205.
• Professor Tippins goes on to reference "[t]he almost infinite potential for mismanaged or maliciously managed joint custody to inflict instability and psychological harm upon the child" (id., at 211), and observes: "The Braiman decision requires mutual cooperation and parental good-faith as a precondition to joint custody. Because these are scarce and precious commodities in matrimonial disputes, the courts have not been inclined to award joint custody where it is opposed by either parent and where the requisite mutual cooper-ation is unlikely. The decisions occasionally observe that no matter how attractive joint custody may seem in concept, the commonly encountered lack of parental cooperation renders it impractical in application and potentially detrimental to the best interests of the children." Id., at 212-213.
Query, whether in the circumstances of this case the "preconditions" for a successful joint custody arrangement—mutual cooperation and parental good faith—are so patently lacking that, as Plaintiff urges, it would "defy logic" to find that she agreed to a custody stipulation wherein "unidentified swathes of Major Decisions" exist that are "without any mechanism for resolution"?
The Court notes in this regard that (1) Plaintiff without notice to Defendant left the marital home and removed the children to New Jersey; (2) Defendant improperly and without notice to Plaintiff accessed confidential information on her electronic devices; (3) Plaintiff was so mistrustful of Defendant that when she returned to New York from New Jersey she did not want to disclose her new address to Defendant; and (4) the parties have spent inordinate sums of money—well beyond their personal means—for attorneys fees to litigate an incontestably acrimonious matrimonial litigation. This does indeed suggest to the Court that the parties may not be able to overcome "the incidents of their own estrangement" sufficiently to succeed under a regimen of joint legal custody.
However, it proves too much—why then did Plaintiff agree to joint legal custody at all? Even the limited version of joint legal custody for which Plaintiff advocates is fraught with difficulty. Although the parties are both Catholic it has been made plain herein that disagreement on religious issues was one of the precipitating factors in the demise of their marriage—and yet they have undisputably agreed to mutual decision-making on religion for their children. Choice of schools has also been a significant bone of contention, much discussed [*6]in open court, and yet the parties have also undisputably agreed to mutual decision-making regarding the education of their children.
As for the absence of a specified mechanism for resolving issues other than religion / education / health, the Court notes that the Stipulation made in open court contained only the "bullet points" of a custody settlement "subject to a complete custody and access stipulation that we would then ask the Court to so order." The parties are, of course, obligated to negotiate the final custody and access stipulation in good faith. Some matters subject to consultation and mutual decision-making do not rise to the level where the involvement of a PC would be necessary or appropriate. The parties are free to negotiate a more informal dispute resolution mechanism for such matters, or to allocate final authority / responsibility for certain decisions to one party or the other. Moreover, the scope of the final joint custody agreement is constrained by certain relatively well-defined parameters governing its mutual decision-making component. First, as the very term denotes, it applies only to "decisions" and not, for example, to preparatory or executive measures undertaken in connection with decisions. Second, the "decisions" must rise above "day-to-day child rearing decisions", which are entrusted exclusively to "the parent with whom the children are living." See, Trapp v. Trapp, supra.
In conclusion, the Court after considering the law of joint legal custody finds nothing therein that would displace a construction of the parties' Stipulation in accord with the plain meaning of the language they employed. The Court accordingly adheres to its conclusion that by this language the parties agreed to "joint legal custody" without qualification, i.e., without delimitation (other than that inherent in the legal term itself) of the areas of the children's life to which it applies; and further, that their agreement to use a PC "solely for major decisions of health, education and religion" is naturally read not as a limitation of the issues subject to consultation and mutual decision-making, but as carving out a subset of those issues for reference to the PC when the parents reach an impasse.
F. The Specific Actions Complained Of
While joint legal custody requires mutual cooperation on major decisions concerning the children, it also requires on the part of each parent a measure of trust in the good faith and sound judgment of the other, i.e., a recognition that despite their own differences each acts with the true good of the children at heart. The Court finds that Defendant's view of what joint legal custody requires of the parties is incorrect with respect to most of the specific actions by Plaintiff of which he complains.
• The choice of an extended summer camp or program would seem to qualify as a major decision, inasmuch as it would have a significant bearing on the child's well-being and education. Here, however, Plaintiff merely enrolled Lu. at L.'s camp for four days during her own parenting time. As a short-term recreational activity confined to Plaintiff's time with the child, that choice has none of the earmarks of a major decision and was entrusted exclusively to the Plaintiff.
• Similarly, the choice of an extended day care arrangement would seem to qualify as a major decision. In this day and age most day care facilities have and indeed tout educational programs even for two-year olds, as witness here the fact that what Plaintiff calls a day care presents itself as a "nursey school & kindergarten." However, the parties acknowledged in proceedings before this Court that Plaintiff was faced with a need to take prompt action to make arrangements for L. and Lu. upon her recent move, just before the start of the school year, back to New York. Under the circumstances, Plaintiff cannot be faulted for enrolling Lu. after providing Defendant with information [*7]concerning the alternatives.
• Taking L. on a new-school visit to get acquainted with the environment, filling out school forms, and bringing him to the doctor for a regularly scheduled physical exam are not "decisions", never mind major decisions. These are all purely executive measures entrusted to the discretion of each parent on his or her own time with the children.
• Plaintiff is free to choose her own Catholic parish, to register the children in her parish, and to take the children to Mass with her when she has them on Sunday. Defendant is likewise free to choose his own Catholic parish, to register the children in his parish, and to take the children to Mass with him when he has them on Sunday. Registration is a purely administrative matter with no impact on the children's religious upbringing. On the other hand, whether they attend Catholic school, where they attend Catholic school, where they pursue religious education, and where they receive their Sacraments are major decisions subject to consultation and mutual decision-making.
G. Conclusion
Items numbered "1(a)" and "2" of Defendant's Order to Show Cause for a declaration concerning the scope and meaning of the parties' June 25, 2024 Stipulation in open court relative to the custody of their minor children are granted to the extent indicated hereinabove. Items numbered "1(b)" and "3" of the said Order to Show Cause are denied, as they relate to matters which remain to be negotiated in good faith as part of the complete custody and access agreement contemplated by the June 25, 2024 Stipulation, the terms of which cannot—without trying custody issues to a conclusion—be imposed upon the parties by the Court.
IT IS SO ORDERED.
The foregoing constitutes the decision and order of the Court.
Dated: October 15, 2024
Carmel, New York
E N T E R
HON. VICTOR G. GROSSMAN, J.S.C.